GRANADA BIOSCIENCES, INC. and Granada Foods Corporation, Appellants,

v.

FORBES, INC. and William P. Barrett, Appellees

No. 14–99–00736–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 12, 2001.

3. The above cited evidence reveals these attempts were minimal, at best.

Michael Sydow, Mary Leigh Harrell, Houston, for appellants.

James George, Peter Kennedy, Davis Donaldson, Austin, for appellees.

Panel consists of Senior Chief Justice MURPHY, Justice HUDSON and FORMER Justice Amidei.*

### OPINION ON REHEARING

MAURICE AMIDEI, Justice.

Appellees' motion for rehearing is overruled; the opinion issued in this case on

* Senior Chief Justice Paul C. Murphy and Former Justice Maurice Amidei sitting by assign- ment.

April 5, 2001, is withdrawn, and the following opinion is issued in its place. Granada Biosciences, Inc. ("GBI") and Granada Foods Corporation ("GFC") separately brought claims for business disparagement against the author and publisher of an article that appeared in *Forbes* magazine. The lawsuits were consolidated, and the trial court granted summary judgment for both defendants. We reverse and remand.

## FACTUAL AND PROCEDURAL BACKGROUND

In its November 11, 1991 issue, *Forbes* magazine published an article, authored by William P. Barrett, entitled "The Incredible Shrinking Empire." Although the article primarily focuses on Granada Corporation, a privately-held company, and its chairman and chief executive, David Eller, the article also refers to "two publicly traded stock companies within the Granada organization," identified as "Granada Foods" and "Granada BioSciences." It is undisputed that these references are to GFC and GBI, respectively.

After the article was published, GBI and GFC filed separate lawsuits, each naming Barrett, Forbes, Inc. (the publisher of *Forbes* magazine), and Cheryl Munke (a former employee of a Granada affiliate) as defendants. Forbes, Inc. and Barrett (collectively "Forbes") filed joint motions for summary judgment in both suits. In each case, Forbes identified the plaintiff's cause of action as one for libel. In responses to both motions, GBI and GFC contended that their respective claims were, in fact, for the tort of business disparagement. Prior to the summary judgment hearing, GBI and GFC amended their petitions to assert their business disparagement causes of action in more detail.

These two lawsuits were consolidated with a third suit filed by Eller and his wife, Linda, against the same three defendants. The trial court granted Forbes's motions for summary judgment, and on September 11, 1995, the court signed two judgments which together disposed of all plaintiffs' claims against all defendants. On appeal, the Amarillo Court of Appeals[1] reversed the portion of the judgment against GBI and GFC in favor of Forbes, and remanded those claims to the trial court. *Granada Biosciences, Inc. v. Barrett*, 958 S.W.2d 215, 225 (Tex.App.—Amarillo 1997, pet. denied). The Amarillo court held that the trial court committed reversible error by granting summary judgment on a cause of action that was not addressed in Forbes's motions. *Id.* at 221. The remainder of the trial court's judgment was affirmed.

On remand, Forbes filed a "Renewed and Supplemental Motion for Summary Judgment." This renewed and supplemental motion sought both a traditional summary judgment under TEX. R. CIV. P. 166a(c) as well as a "no evidence" summary judgment under TEX. R. CIV. P. 166a(i). The trial court granted the motion, and on May 24, 1999, the court entered a final judgment that GBI and GFC take nothing. The sole issue on this appeal is whether the trial court erred in granting summary judgment for Forbes.

## SUMMARY JUDGMENT STANDARD

In a traditional motion for summary judgment, the movant has the burden of showing, with competent proof, that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548

1. The appeal from the trial court's September 11, 1995 judgment was transferred to the Seventh Court of Appeals in Amarillo, pursuant to Section 73,001 of the Texas Government Code.

(Tex.1985). When a defendant is the movant for summary judgment, it has the burden to conclusively negate at least one essential element of the plaintiff's cause of action, or conclusively establish each element of an affirmative defense. *American Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). If the movant's motion and summary judgment proof facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a material fact issue sufficient to defeat summary judgment. *HBO v. Harrison*, 983 S.W.2d 31, 35 (Tex.App.—Houston [14th Dist.] 1998, no pet.). In deciding whether a disputed material fact issue exists precluding summary judgment, we indulge every reasonable inference in favor of the non-movant and take all proof favorable to the non-movant as true. *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997); *Nixon*, 690 S.W.2d at 548–49.

■ On a "no evidence" summary judgment, we review the proof in the light most favorable to the non-movant and disregard all proof and inferences to the contrary. *Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 432 (Tex.App.—Houston [14th Dist.] 1999, no pet.). A no-evidence summary judgment is improperly granted if the non-movant counters with more than a scintilla of probative proof to raise a genuine issue of material fact. *Id.* Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of the existence of a fact. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists when the evidence "rises to a level that would enable

reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) (quoting *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)).

■ In the order granting summary judgment in favor of Forbes, the trial court did not state the specific grounds for its ruling. Therefore, we will affirm if any of the theories advanced in the motion for summary judgment are meritorious. *See Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

## ELEMENTS OF BUSINESS DISPARAGEMENT

■ GBI and GFC both allege that Forbes is liable for business disparagement. The elements of such a claim are (1) publication of disparaging words by the defendant, (2) falsity, (3) malice, (4) lack of privilege, and (5) special damages. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987). The parties strongly disagree, however, on how these elements should be applied to a claim for business disparagement brought by a public figure [2] against a media defendant, in light of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny. We therefore begin by analyzing each of the elements as set forth by our supreme court in *Hurlbut*.

### A. Publication of Disparaging Words by the Defendant

■ It is undisputed that the article in question constitutes a publication by

---

**2.** In its various motions for summary judgment, Forbes alleged that GBI and GFC were both public figures for the purpose of discussing their respective financial statuses. GBI and GFC never challenged this claim in the trial court, instead asserting that each company's "status as a limited purpose public figure is totally irrelevant." Nor does either company attempt to refute this allegation in their briefs. We therefore take as true the assertion that GBI and GFC are both public figures.

both Forbes, Inc. and Barrett. To support a claim for business disparagement, the published statements must be, at a minimum, defamatory. *See Delta Air Lines, Inc. v. Norris,* 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, writ denied). Whether the words used are reasonably capable of a defamatory meaning is a question of law. *See Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 654 (Tex.1987). The court construes the statement as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement. *Id.* at 655. A statement that would ordinarily tend to injure a plaintiff's business reputation, resulting in financial injury, is defamatory. *See General Motors Acceptance Corp. v. Howard,* 474 S.W.2d 929, 932 (Tex.Civ.App.—Beaumont 1971), *aff'd,* 487 S.W.2d 708 (Tex.1972).

�oxo In the trial court, Forbes argued that to support a business disparagement claim, the allegedly disparaging statements must be "of and concerning" GBI or GFC. GBI and GFC do not dispute this requirement,[3] but rather allege that Forbes's interpretation is too narrow. Forbes apparently asserts that only those statements which specifically mention or reference GBI or GFC by name are actionable. Under Texas law, however, it is not necessary that the plaintiff be named if those who knew and were acquainted with the plaintiff understand from reading the publication that it referred to plaintiff. *Newspapers, Inc. v. Matthews,* 161 Tex. 284, 289–90, 339 S.W.2d 890, 894 (1960). *Accord Croixland Props. Ltd. P'ship v. Corcoran,* 174 F.3d 213, 216 (D.C.Cir.) ("To satisfy the 'of and concerning' ele-

ment, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."), *cert. denied,* 528 U.S. 1021, 120 S.Ct. 531, 145 L.Ed.2d 411 (1999).

**B. Falsity**

▬▬▬ The plaintiff in a business disparagement claim must plead and prove the falsity of the publication as part of its cause of action. *Hurlbut,* 749 S.W.2d at 766. A showing by the defendant of the substantial truth of a publication negates the essential element of falsity, and thus entitles the defendant to summary judgment. *See McIlvain v. Jacobs,* 794 S.W.2d 14, 15 (Tex.1990). The test used in deciding whether a publication is substantially true involves consideration of whether the publication was more damaging to the plaintiff's reputation, in the mind of the average reader, than a truthful statement would have been. *See id.* at 16.

**C. Malice**

▬▬▬ While the parties agree that "malice" is an essential element of a business disparagement claim, they are sharply divided on how to apply this element. Forbes contends that because GBI and GFC are public figures suing a media defendant, they must prove that the publication was made with "actual malice." "Actual malice" is defined as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. "Reckless disregard" means that

---

**3.** Forbes contends that the "of and concerning" element is constitutionally required in defamation cases, citing *New York Times,* 376 U.S. at 288, 292, 84 S.Ct. at 730, 733, and therefore a necessary element of a business disparagement claim. Because GBI and GFC have not disputed this requirement, either in the trial court or on appeal, we assume without deciding that GBI and GFC bear the burden of proving that the allegedly disparaging words were "of and concerning" one or both of them.

the publisher "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In assessing actual malice, it is the defendant's state of mind "at the time of publication" that is determinative. *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 498, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *see also Secord v. Cockburn,* 747 F.Supp. 779, 792 (D.D.C.1990) ("[T]he existence or non-existence of [actual] malice must be determined as of the date of publication."); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 564 (S.D.N.Y.1984) ("[A]ctual malice rests on the defendant's state of mind at the time of publication."). Thus, proof of actual malice requires sufficient evidence to permit the conclusion that, at the time of publication, the defendant either knew the statement was false or entertained serious doubts as to the truth of the publication. *See Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771, 771–72 (Tex.1994) (per curiam).

GBI and GFC argue, however, that the standard of "actual malice" applied in defamation cases is inapplicable here. Instead, they claim that the proper definition of "malice" in a suit for business disparagement comes from the Texas Supreme Court in *Hurlbut:*

> [T]he defendant in an action for business disparagement or injurious falsehood is subject to liability "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." [*Hurlbut,* 749 S.W.2d at 766 (quoting RESTATEMENT (SECOND) OF TORTS § 623A cmt. g (1977)).]

Thus, GBI and GFC contend that, in any suit involving a claim for business dispar-

agement, the element of malice may be proven in one of four ways:

(1) the defendant knew of the falsity of the publication; *or*

(2) the defendant acted with reckless disregard concerning the falsity of the publication; *or*

(3) the defendant acted with ill will; *or*

(4) the defendant intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.

At the outset, we note that the plaintiff in *Hurlbut* was a private individual. GBI and GFC nevertheless argue that the *Hurlbut* court's enunciation of the standard for imposing liability in a business disparagement suit should be applied regardless of the plaintiff's status. We disagree.

The United States Supreme Court's requirement of "actual malice" was not developed for the purpose of distinguishing claims for defamation from other torts. In *New York Times,* the Court was faced with the conflict between the protections afforded by the First and Fourteenth Amendments and a state's power to award damages for defamatory statements. The Court concluded that when the plaintiff is a public official, the constitutional guarantee of freedom of expression prohibits that plaintiff from recovering damages unless the defamatory statement was made with actual malice. 376 U.S. at 279–80, 84 S.Ct. at 726. This requirement was later expanded to apply to public figures as well. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335–37, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). The plaintiff's evidence must be clear and convincing to support a recovery. *See Casso v. Brand,* 776 S.W.2d 551, 558 (Tex.1989).

In *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), the Supreme Court applied this

same First Amendment limitation to a claim for intentional infliction of emotional distress. The Court held that public figures and public officials could not recover without showing, in addition to the stated elements of the cause of action, "that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true." 485 U.S. at 56, 108 S.Ct. at 882.

GBI and GFC nonetheless contend that defamation and business disparagement are two separate torts, protecting different interests, and thus have different elements of proof. *See Hurlbut*, 749 S.W.2d at 766 (noting that defamation protects personal reputation, whereas business disparagement protects economic interests). While this is undoubtedly true, GBI and GFC fail to provide any explanation why this difference would prevent a court from applying the constitutional protections set forth by *New York Times* and its progeny. Although defamation and business disparagement may be designed to protect different interests, both causes of action seek to impose liability for injuries caused by "publications to third parties of a false statement affecting the plaintiff." *Id.* There can be no dispute, therefore, that the same conflict recognized by the Supreme Court in *New York Times*—the conflict between constitutionally-protected free expression and a state's power to award damages based on a defendant's statements—is present in business disparagement claims as well as defamation.

Furthermore, the court in *Hurlbut* expressly noted that the differences between the two torts historically resulted in "[m]ore stringent requirements" on plaintiffs who allege business disparagement.[4] *Id.* at 766. Under GBI and GFC's theory, the differences between the two torts, which were designed to make it *more difficult* to recover for business disparagement, would in fact make business disparagement claims *easier* to prove in those cases where the First Amendment is implicated. We decline to adopt such an interpretation.

■ We therefore hold that, when the plaintiff in a business disparagement cause of action is a public official or public figure, that plaintiff has the burden of proving by clear and convincing evidence that the disparaging words were published with knowledge that they were false or with reckless disregard as to whether or not they were true.

### D. Lack of Privilege

■ As our supreme court points out in *Hurlbut*, there are two classes of privileges applicable to defamation cases—"absolute" privileges and "conditional or qualified" privileges. *Id.* at 768. An absolute privilege may more properly be thought of as an immunity because it is based on the personal position or status of the actor. *Id.* Such immunity attaches only to a limited number of situations involving the administration of the functions of the branches of government, such as statements

---

4. Specifically, the *Hurlbut* court noted that the traditional requirements for defamation claims differ from those for business disparagement in three respects—"falsity of the statement, fault of the defendant and proof of damage." *Id.* at 766 (quoting RESTATEMENT (SECOND) OF TORTS § 623A cmt. g (1977)). Business disparagement requires a plaintiff to plead and prove falsity, whereas the common law presumed that a defamatory statement was false. Regarding fault, a defamation defendant was held strictly liable at common law, whereas the plaintiff in a business disparagement suit must establish culpability. Finally, the business disparagement plaintiff must prove pecuniary loss, whereas a defamation plaintiff was required to do so only in limited situations.

made during legislative and judicial proceedings. *Id.*

 A conditional or qualified privilege, on the other hand, is a true privilege because it arises out of the occasion upon which the allegedly false statement is published. *Id.* Circumstances that may give rise to a conditional privilege include those that induce: (1) a belief that publication protects the publisher's interest; (2) a belief that publication protects the interest of certain recipients or third persons; (3) a belief that a person sharing a common interest in the published information is entitled to know that information; (4) a belief that the publication protects a family member of the publisher or of certain recipients or third persons; and (5) a belief that an important public interest requires publication. *See id.;* RESTATEMENT (SECOND) OF TORTS §§ 594–598 (1977). A conditional or qualified privilege is defeated, however, when the privilege is abused, such as when the person making the defamatory statement knows the statement is false or acts for some purpose other than protecting the privileged interest. *Hurlbut,* 749 S.W.2d at 768. Thus, because a conditional or qualified privilege would be defeated by a finding of malice, and malice is a necessary element of a business disparagement cause of action, the court in *Hurlbut* concluded that such privileges are irrelevant in the context of business disparagement. *Id.*

In its motion for summary judgment, Forbes argued that GBI and GFC cannot recover, under any theory, for statements in the article that were "protected by the opinion and fair comment privileges." GBI and GFC respond that opinion and fair comment are conditional privileges, and therefore are not appropriate for consideration in a claim for business disparagement. GBI and GFC point to the Texas Supreme Court's statement in *Hurlbut* that "[i]n the context of a tort such as business disparagement or injurious falsehood, only absolute privileges have relevance to the defendant." 749 S.W.2d at 768. The "privileges" at issue here, however, are distinct from the common-law privileges that the court discussed in *Hurlbut.* The opinion and fair comment privileges are more properly characterized as protections or "constitutional privileges," as they arise from limitations on the plaintiff's cause of action imposed by the United States and Texas Constitutions. *See* RESTATEMENT (SECOND) OF TORTS § 580A cmt. e (1977).

 The Supreme Court has held that, at least with respect to media defendants, a statement of opinion relating to matters of public concern that does not contain a provably false factual connotation is entitled to "full constitutional protection." *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Additionally, the First Amendment provides protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* (quoting *Falwell,* 485 U.S. at 50, 108 S.Ct. at 879). Likewise, the Texas Constitution, at a minimum, protects statements of opinion that do not connote false facts. *See Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 122 (Tex.2000).[5] Thus, the

---

**5.** In *Carr v. Brasher,* 776 S.W.2d 567 (Tex. 1989), the Texas Supreme Court stated that "[a]ll assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution." *Id.* at 570. However, the U.S. Supreme Court has since rejected the notion of a blanket constitutional privilege for all statements characterized as "opinion." *See Milkovich,* 497 U.S. at 21, 110 S.Ct. at 2707.

*Hurlbut* court's statement that conditional privileges have no relevance in a business disparagement claim does not negate any constitutional privileges that may be available to Forbes.

### E. Special Damages

Finally, the plaintiff in a business disparagement claim must prove special damages, in the form of a pecuniary loss. To satisfy this element, a plaintiff must "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." *Hurlbut,* 749 S.W.2d at 767 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 128, at 971 (5th ed.1984)). The plaintiff must prove that the allegedly disparaging communication played a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss of trade or other dealings, is established. *Id.*

### THE FORBES ARTICLE

Having reviewed the elements of a claim of business disparagement, we now turn to the substance of GBI's and GFC's claims. In its Renewed and Supplemental Motion for Summary Judgment, Forbes sought summary judgment on the following grounds:

(1) GBI and GFC may not bring business disparagement claims based on statements that are not "of and concerning" GBI or GFC;

(2) GBI and GFC may not bring business disparagement claims based on statements that do not defame GBI or GFC;

(3) all statements in the article that are of or concerning GBI or GFC are substantially true;

(4) GBI and GFC cannot recover under any legal theory for statements that are protected expressions of opinion and fair comment on a matter of public concern; and

(5) Forbes did not know at the time of publication that the article contained false statements about GBI or GFC, nor did it have actual, substantial doubts about the truth of those statements.

With respect to its first ground for summary judgment, Forbes admitted that at least seven passages in the article are "of and concerning" GBI, GFC, or both. In addition, many passages refer simply to "Granada" without further description. In his affidavit submitted in support of Forbes's motion, Barrett states that he "used the term 'Granada' in a generic sense to describe the organization of subsidiaries, affiliates, limited partnerships, joint ventures and other business organizations .... When I intended to specifically address [GBI] or [GFC], I did so by name." However, Barrett's subjective intent is irrelevant in determining whether a statement in the article is "of and concerning" GBI or GFC. Rather, this determination is made from the standpoint of the reader. *See Matthews,* 339 S.W.2d at 894; *see also Musser,* 723 S.W.2d at 655 (observing that, in determining whether words are reasonably capable of a defamatory meaning, "[t]he court construes the statement ... based upon how a person of ordinary intelligence would perceive the entire statement"). Thus, the proper inquiry is whether a person of ordinary intelligence who is familiar with GBI and

---

More recently, the Texas Supreme Court refused to express its opinion concerning "whether the Texas Constitution affords greater protection to statements of opinions than *Milkovich*." *Turner,* 38 S.W.3d at 122 n. 5.

GFC would believe that the references to "Granada" referred to GBI or GFC.

■ GBI and GFC presented the trial court with the affidavit of Richard E. Tinsley. Tinsley stated that he was "generally aware of the existence of Granada Corporation and various of its affiliates," and that he "understood the article and the specific statements in it to be directed at the public companies." Forbes never refutes this summary judgment proof. Accordingly, we conclude that a fact issue exists regarding whether the article's references to "Granada" are statements of and concerning GBI or GFC.[6]

■ In its second and third grounds for summary judgment, Forbes argues that those statements in the article that are of and concerning GBI or GFC either do not defame the companies, or the statements are substantially true. As an initial matter, we consider whether GBI and GFC have properly brought forth a claim that the article as a whole presented a false and defamatory impression of events. The Texas Supreme Court has recently confirmed that Texas law recognizes a cause of action for defamation based on a publication as a whole. *Turner*, 38 S.W.3d at 114. We likewise conclude that a business disparagement plaintiff may contend that a publication is disparaging if, taken as a whole, it creates a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. *See id.* at 115.

■ Forbes argues that GBI and GFC have waived this argument because they failed to raise such a theory in response to Forbes's renewed and supplemental motion for summary judgment. In its response to the motion, however, GBI and GFC stated: "Virtually in its entirety, the *Forbes* article is disparaging and false. . . . Plaintiffs have raised fact issues regarding the false and disparaging nature of certain statements as well on the tone of virtually the *entire Forbes* article." (emphasis in original). Later in their response, GBI and GFC contended that David Eller's deposition testimony "raises a fact issue with regard to the entire article's false and disparaging character." We conclude that GBI and GFC's response adequately presented the trial court with the issue of whether the publication as a whole was false and disparaging to GBI and GFC.

■ In addition, the response to Forbes's motion for summary judgment identified 19 specific passages from the article that GBI and GFC contend to be false and disparaging.[7] Forbes admits that one of the published statements— "Among the many people suing Granada is Fort Worth near-billionaire Edward Bass"—is false. Although a person named Ed Bass was among the named plaintiffs in a lawsuit brought against Granada Management Corporation (a separate Granada entity) and others, he is not the "near-billionaire" Edward Bass from Fort Worth. Forbes argues that the "gist" of

---

6. We agree with Forbes, however, that some of the statements in the article refer specifically to a separate legal entity or person, and therefore cannot be "of and concerning" GBI or GFC. For example, the statement "Houston's Granada Corp. talks of 1991 revenues of $2 billion" clearly refers to Granada Corporation as opposed to GBI or GFC. Similarly, any statement which refers specifically to either GBI or GFC, but not both, is not a statement "of and concerning" the other.

7. GBI and GFC's response set forth excerpts from Eller's deposition in which he identified 9 passages from the article that he claimed were false. In addition, Eller's affidavit included a table, incorporated into GBI and GFC's response, identifying 10 more passages alleged to be false.

this statement is substantially true and not defamatory as a matter of law, as it would make no difference in the mind of the average reader which Ed Bass was a plaintiff in the lawsuit. We disagree. A person of ordinary intelligence might well consider a lawsuit to be of greater merit if it is reported that a wealthy or powerful individual had initiated the suit. Indeed, the fact that Forbes singled out Edward Bass's name from the "many" people suing, based solely on his status as a "near-billionaire," belies its claim that the identity of Ed Bass would carry no significance to an average reader.

We also find that GBI and GFC have raised a fact issue with respect to the falsity and defamatory nature of at least three other passages within the article:

> PASSAGE 1: "There are two publicly traded stock companies within the Granada organization, Granada Foods (1990 revenues, $149 million) and Granada BioSciences ($16 million). They are so broke they haven't been able to publish their 1990 annual reports."

Forbes does not appear to dispute that the second sentence is disparaging, but rather argues that it is substantially true. In support of this contention, Forbes relies upon the following summary judgment proof:

- neither GBI nor GFC had published its annual report at the time the *Forbes* article was published, despite American Stock Exchange rules requiring the reports to be published by May 31, 1991;
- Barrett stated in his affidavit that Nancy Hudgins, a "Granada public relations person," told him that the annual reports were ready to print and distribute "but David Eller dragged his feet and asked lots of questions about how much they cost and how to cut costs. He even asked her to have the printing job done at Kinko's";
- Barrett further stated that he specifically asked Ronnie Calhoun, Granada's former accountant, if "Granada was out of cash and he said, 'That's right. Bingo.' "

Regardless of whether GBI and GFC failed to publish their annual reports timely, Forbes concedes that the article's suggestion that this failure was caused by lack of money was merely a "conclusion" that Barrett drew from the information he had received. In response, GBI and GFC submitted David Eller's affidavit, in which he states: "The annual reports of both GBI and GFC were finished as of the date of the article and all costs incurred for printing them had been paid." In his deposition, Eller similarly testified that both reports "were printed and ready to go in final proof at the time Mr. Barrett's article came out." We conclude that a fact issue exists as to whether or not this passage is false.

> PASSAGE 2: "Last year Granada BioSciences announced executives had bought $300,000 of stock with company loans, a seeming vote of confidence. Only later did it become known that the company would cover any losses."

Again, Forbes does not dispute the disparaging nature of this passage, but rather contends that it is substantially true. GBI and GFC assert that this statement is false because it wrongly suggests that GBI's guarantee of any such loans was not disclosed in advance of the transactions. According to Eller's affidavit:

> The stock purchases by GBI executives were reported to the SEC and at the time, GBI issued a press release which clearly disclosed the officer loan program at the time of its implementation and prior to the purchasing of the stock

or the reporting thereof. This prior disclosure was also submitted to the American Stock Exchange.

Forbes argues that the passage refers only to GBI's failure to mention the true nature of the loan program in its original press release. Eller acknowledged during his deposition that GBI's initial press release announcing the stock purchases did not reveal that the company had provided nonrecourse loans, so that the executives would not be required to pay back the loans if the value of the stock fell. Barrett also presented evidence showing that several articles describing the executive stock purchase did not mention that the loans were nonrecourse. As with "of and concerning," however, the focus for determining "substantial truth" is not the author's subjective intent, but rather the statement's effect upon the average reader. *See McIlvain*, 794 S.W.2d at 16. Although a technically true statement might indeed have caused damage to GBI's business reputation, we believe that a fact issue exists concerning whether the statement as written was more damaging, viewed from the average reader's perspective, than a truthful statement would have been.

**PASSAGE 3: "But this is not exactly unheard-of stuff at Granada; in the course of continuing litigation, a Granada employee admitted under oath that he signed back-dated loan and corporate documents at the direction of superiors."**

We find that this passage is reasonably capable of a defamatory meaning. The admission referred to in this passage was a written statement[8] signed by Oliver Bright that was apparently part of the record in a lawsuit involving a Granada entity. According to Barrett, Bright "admitted signing backdated corporate documents."[9] In his affidavit, Eller states that Bright "was never a 'Granada employee'" but instead was an employee of a company in which Granada Corporation had made an investment and to which it had loaned money. Indeed, both of the allegedly back-dated documents, attached to Bright's statement, bear the heading of "Immuno Modulators Laboratories, Inc.," and both purport to be signed by the directors of that corporation. Furthermore, Bright's statement does not indicate on its face that Bright signed "at the direction of superiors," but rather that he

8. Both parties erroneously refer to this statement as an "affidavit." Although the document was signed and witnessed by a notary, there is no indication that the person signing the statement swore to or otherwise affirmed the facts stated therein. *See* TEX. GOV'T CODE ANN. § 312.011(1) (Vernon 1998).

9. Bright's statement, submitted to the trial court as an exhibit to Forbes's summary judgment motion, consists of a one-page document, signed by Bright and dated March 18, 1987, and also signed by a witness and notary. The document states:

To whom it may concern:
On March 18, 1987, I was asked by Christopher Zakrewski, a Granada Corporation attorney, to sign a Waiver of Notice of Meeting dated May 16, 1986. I was asked to obtain Dr. Georgiades' signature.

The purpose listed as a business item is "Approving the Settlement Agreement by and between the Company and Ventrex Laboratories, Inc." Since that transaction was actually signed prior to the date for which I am asked to sign a waiver, I am asking for a witness to the timing of my signature and having a Notary verify[.]
Also, on this date (3/18/87) I was asked to sign a Unanimous Consent of the Board dated 1/24/86 in which Tom Easley, Darold McCalla and I were authorized to execute a $2.3 million Promissory Note to Granada Corporation. As I sign this Consent I have secured a witness and Notary Public to verify dates of documents and actual dates of signing.

was "asked" to sign by "a Granada Corporation attorney." Eller also states that no documents were ever back-dated, but rather the documents in question were signed in response to repeated Granada Corporation requests for formal loan documentation and reflected that they were "effective" as of the time that the loans were made. We cannot say that there is no issue of material fact concerning the alleged falsity of this passage.

As its fourth ground for summary judgment, Forbes argued that GBI and GFC are precluded from recovering for statements protected by the opinion and fair comment privileges. In its motion, however, Forbes identified only six statements in the article that it claims to be conclusions or expressions of opinion. Of these, only three correspond with those statements identified by GBI and GFC in their response to the summary judgment motion. Thus, with respect to the majority of statements complained of by GBI and GFC, as well as the publication as a whole, the opinion and fair comment protections do not apply.

▮ Finally, Forbes contends that GBI and GFC cannot prove that Forbes published the article in question either with knowledge that the publication was false or with actual, substantial doubts as to its truth. Although a plaintiff's burden at trial requires proof of "actual malice" by clear and convincing evidence, this heightened standard is not appropriate when reviewing the proof on a motion for summary judgment. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 421 (Tex.2000). We therefore review Forbes's claim that it has negated the element of actual malice as a matter of law under our traditional summary judgment standard. *See id.*

▮ We begin our review by analyzing GBI's and GFC's claims with respect to

the publication as a whole. In support of Forbes's motion for summary judgment, Barrett stated in his affidavit: "Every fact that I included in the story I believed was true. . . . If any fact in the article is substantially false, I did not write it, and *Forbes* did not publish it, knowing that it was substantially false or with a high degree of awareness of its probable falsity." Barrett's affidavit further sets forth in considerable detail his basis for each of the passages contained in the article. According to Barrett, his review of the article "confirms that the passages were true or, at least, I had very good reason to believe they were true; certainly I had no reason to believe that they were false." However, even when the discrete facts within a publication are literally or substantially true, a publication may still be defamatory if those facts are presented in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way. *Turner*, 38 S.W.3d at 115. We have found nothing in the summary judgment record addressing GBI and GFC's contention that the article was misleading and defamatory when viewed in its entirety. Accordingly, we conclude that Forbes has failed to show its entitlement to judgment as a matter of law with respect to the publication as a whole.

Furthermore, we conclude that a fact issue exists with respect to whether, at the time the article was published, Forbes was acting with actual malice. Eller states in his affidavit that when he was first contacted by Barrett in the early fall of 1991, Barrett agreed to allow Eller to review the article before it was published. On Friday, October 25, 1991, Eller received a copy of "what [Barrett] said was a draft of the article" at his office. After reviewing the article, Eller telephoned Barrett that day and they, along with Eller's wife, dis-

cussed the article. According to Eller, he told Barrett that the article "contained innumerable false statements and clearly misleading and false innuendos." Eller then immediately began working with his staff and legal counsel to prepare a response to the article. Over the weekend, Eller transmitted a letter to Barrett for delivery on Monday, October 28, with copies to two senior executive officers of *Forbes* magazine, detailing various alleged inaccuracies in the article.

Forbes contends that Eller's letter cannot constitute evidence of actual malice. To determine whether a publisher had the necessary subjective intent requires an understanding of when the statement at issue was "published." *See Bose Corp.*, 466 U.S. at 498, 104 S.Ct. at 1958. In his affidavit, David Eller states that the article was "on the street" the morning of Monday, October 28. Therefore, according to Forbes, Eller's letter was not received, and therefore could not have given Forbes notice of any alleged falsities, until after the article was published. However, GBI and GFC argue that the letter was sent in response to Barrett's representation during the October 25 telephone call that if Eller delivered his comments by Monday, there would be time to make corrections before publication. Thus, even if we accept as true that the article was published before or simultaneously with receipt of the let-

ter, there is some summary judgment proof from which a reasonable factfinder might conclude that Eller's delivery of the letter was intentionally delayed by Barrett's alleged representation. This in turn creates a fact question as to Barrett's state of mind at the time of publication, provided that the article was not published until after Barrett's representation.[10]

■ Forbes argues that during the October 25 telephone call between Barrett and the Ellers, both sides recognized that the article was "in print." In addition, GBI and GFC do not dispute Barrett's statement that the story "locked up" on October 21. From this, Forbes apparently contends that it was understood that the article had already been published. We disagree.

The October 25 telephone call was tape recorded, apparently by Barrett.[11] The relevant portions of that conversation are as follows (emphasis added):

MR. BARRETT: So where did I screw up?

MR. ELLER: Well, if—I don't know what kind of time line you're on. What I'd like to do is—is just kind of go through and—and itemize some of the things here -

MR. BARRETT: Fine.

MR. ELLER:—and fax it back to you.

---

10. Our determination that a fact question exists is based not on the substance of the letter, in which Eller refutes various statements in the article, but rather on Barrett's conduct. Thus, this case is distinguishable from *Huckabee v. Time Warner Entertainment Co.*, 19 S.W.3d 413, 427 (Tex.2000) (stating that a defamation defendant's knowledge of the plaintiff's denials or explanations, without more, is not evidence that the defendant doubted the allegations).

11. A tape recording of the phone call was played during Eller's deposition and tran-

scribed by the court reporter. Eller confirmed that the tape was an accurate recording of their conversation, but that the following exchange took place before the recording began:

I called him, and the first thing that he said after we identified each other was, "What do you think about the article?" And I said, "I think it's loaded with lies and falsehoods and misstatements." And he said, "Well, I know of one, which is the Ed Bass deal, and I'm very mad about my source for that. Could you hold just a minute?"

MR. BARRETT: Well, why don't you just give me an idea.

....

MR. ELLER: And I'd rather just get it set up the way that—that I think that it's wrong, and then you and I can talk about it, okay?

MR. BARRETT: All right. Well, I always like to know where you're coming from.... I am aware of one error that was called to my attention today, which is that the Ed Bass is a different Ed Bass. One of the lawyers in the case had told me it was and now says, "Oh, no, that's wrong." So that's—that's clearly in error.

MR. ELLER: Well, there are a couple of things like that that I just wanted to go through -

MR. BARRETT: Well, tell me what some of the other major ones are.

MR. ELLER: If it's—if it's okay, I'd rather just—I've just read it through one time and I've got—you know, and I didn't know what your time frame was this afternoon. And I just thought I'd call you and tell you I've got it, I'd like to go through it, and I'll get back to you real promptly with everything that I can think of, and then we -

MR. BARRETT: Well, you've got my fax number, I guess.

....

MR. ELLER: .... *Is—is Monday too late for you on this?*

MR. BARRETT: *Well, listen, you know, the thing is in print,* so—you know, I like to know when—when things are wrong.... I—I can't win them all, but I—you know, I do—we do try to correct these things. And -

MR. ELLER: Sure.

MR. BARRETT:—you know, to my way of thinking, virtually everything in that story was confirmed by one or more of—of all of you or—or from documents or—or whatever. So that's why I'm keenly interested in anything you think I've got wrong.

....

MR. ELLER: .... I'm not calling you just to fight about issues.

MR. BARRETT: No, I don't mind. That's part of what this is all about.

MR. ELLER: I'd just like to clarify them, and then—then if we have to fight about some of them, I will.

MR. BARRETT: Well, I'm—look, I'm happy to—I'm happy to clarify.

MR. ELLER: Okay. *But you're in print now and—but Monday wouldn't be too late?*

MR. BARRETT: *Oh, no.* I mean, like I say, I'm happy to talk about it now or whenever you want.

MR. ELLER: Okay. I'll get it back to you no later than Monday. And if I can get it back to you earlier, I will.

MR. BARRETT: All righty.

Viewed in context, and considering Barrett's alleged prior representation that Eller would be given an opportunity to review the article before publication, we believe that Barrett's statement that the article was "in print" was, at best, ambiguous.

Moreover, in the context of determining when a defamation cause of action accrues against a mass media defendant for statute of limitations purposes, this court has held that "publication is complete on the last day of the mass distribution of copies of the printed matter. It is that day when the publisher, editors and authors have done all they can to relinquish all right of control, title and interest in the printed matter." *Holloway v. Butler*, 662 S.W.2d 688, 692 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.). Establishing the time of publication requires more than the

author's statement that the article is "in print" or "locked up." Because the summary judgment proof raises a question as to whether the October 25 conversation took place before the article was published, we conclude that GBI and GFC have raised a fact issue as to Forbes's state of mind at the time of publication.

 As noted above, Forbes also moved for a "no evidence" summary judgment under Rule 166a(i), asserting that GBI and GFC failed to present summary judgment proof on the essential elements of a business disparagement cause of action. Based on our discussion of Forbes's asserted grounds for a traditional summary judgment, we conclude that GBI and GFC have produced sufficient summary judgment proof on each of the first four elements: publication of disparaging words, falsity, malice, and lack of privilege.[12] We therefore turn to the final element of the business disparagement claim—damages.

In his affidavit, Eller states that, following publication of the *Forbes* article, many of the vendors doing business with GBI and GFC curtailed their credit arrangements, paralyzing both companies from carrying on business activities. We conclude that GBI and GFC have presented more than a scintilla of evidence to support their claim that they have suffered special damages as a result of Forbes's publication.

## CONCLUSION

GBI and GFC have presented sufficient proof to raise a material issue of fact with respect to each element of their claims for business disparagement. Accordingly, the trial court erred in granting summary

judgment for Forbes. We reverse the trial court's judgment and remand to the trial court for further proceedings consistent with this opinion.

---

12. As noted above, the privileges that a business disparagement plaintiff is required to negate as an element of the claim are only those common-law privileges set forth in *Hurlbut*. Assuming that the plaintiff has made a prima facie case under the appropriate standard for malice, the plaintiff defeats any conditional privileges.