IN THE SUPREME COURT OF TEXAS








IN 
THE SUPREME COURT OF TEXAS
 

No. 
01-0788

 
Forbes Inc. And William P. 
Barrett
 
v.
 
Granada Biosciences, Inc. 
And Granada Foods Corporation
 

On Petition for Review from 
the
Court of Appeals for the 
Fourteenth District of Texas

 
Argued on January 15, 2003
 
Justice O=Neill delivered the opinion of the 
Court, in which Chief Justice 
Phillips, Justice Hecht, Justice 
Owen, Justice Jefferson, Justice Smith, Justice Wainwright, and Justice Brister 
joined. 
 
Justice Schneider did not participate 
in the decision.
 
            
Granada Biosciences, Inc. and Granada Foods Corporation sued Forbes, 
Inc., publisher of Forbes magazine, and writer William P. Barrett for 
business disparagement.  The trial 
court rendered summary judgment for Forbes and Barrett, and the court of appeals 
reversed.  49 S.W.3d 610.  We hold that the court of appeals erred 
in reversing the trial court=s 
summary judgment because the plaintiffs produced no evidence that Forbes and 
Barrett acted with actual malice in publishing the article that is the subject 
of this controversy.  Accordingly, 
we reverse the court of appeals= 
judgment and render judgment for Forbes and Barrett.


I


In 
its issue dated November 11, 1991, Forbes published an article entitled AThe 
Incredible Shrinking Empire.@[1]  The article, authored by Barrett, 
focused on the financial condition of the Granada Corp., a privately held 
company, and on its chairman, David Eller.  
Granada Corp. was the parent of a number of other private and public 
entities.  While the Granada 
organization consisted of dozens of entities, the article only named two of the 
public entities, Granada Foods Corp. (GFC) and Granada 
Biosciences, Inc. (GBI).  In general, the Granada entities were 
engaged in developing and applying advanced technology in the area of 
agriculture, primarily cattle production.  
The article noted that the Wall Street Journal had described 
Granada Corp. as a Acorporate 
star[] of the future@ 
in 1989, and that the organization, under Eller=s 
stewardship, had garnered much favorable publicity.  But, the article said, Athere 
is less to Granada than meets the eye.  
Actually, its total revenues, $1 billion as recently as 1988, will 
scarcely be $200 million for 1991.  
Profits: zilch.  Granada=s 
work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 
25,000 from 1 million.@  The article identified GFC and GBI as the two publicly 
traded stock companies within the Granada organization, and said that they were 
Aso 
broke they haven=t 
been able to publish their 1990 annual reports.@  It went on to say that AGranada 
is beset with a series of serious shareholder lawsuits,@ 
including one filed by AFort 
Worth near-billionaire Edward Bass.@  It is undisputed that, while a person 
with that name had sued one of the Granada entities, it was not the AFort 
Worth near-billionaire.@  Furthermore, the article described a 
number of other signs of serious financial trouble: APossibly 
anticipating a bankruptcy filing, former Granada employees say officials in 
recent months have moved some farm equipment and vehicles off Granada books and 
gotten rid of backup documentation.@
According 
to Barrett=s 
affidavit, he used the term AGranada@ 
in a generic sense to describe the various entities controlled by Eller, and 
when he Aintended 
to specifically address Granada Biosciences, Inc. or Granada Food Corporation, 
[he] did so by name.@  The day the article was released, the 
shares of GBI and GFC 
dropped precipitously, and trading was permanently suspended in early 
1992.


GBI, GFC, Eller, and his wife, 
Linda, sued Barrett, Forbes, Inc., and Cheryl Munke, 
an employee of a former Granada affiliate, for damages allegedly caused by the 
article=s 
publication.  Forbes and Barrett 
(collectively AForbes@) 
filed joint motions for summary judgment, which the trial court granted.  On appeal, the Seventh District court of 
appeals, to which the case was transferred, reversed, holding that Forbes=s 
summary judgment motion did not address the plaintiffs= 
business disparagement claims.  
Granada Biosciences, Inc. v. Barrett, 958 S.W.2d 215, 221 (Tex. 
App.BAmarillo 
1997, pet. denied).[2]  On remand, Forbes filed a renewed and 
supplemental summary judgment motion under Rule 166a(c) and(i), which specifically addressed the plaintiffs= 
business disparagement claims.  The 
trial court again granted summary judgment in Forbes=s 
favor, but the Fourteenth District court of appeals reversed, concluding that 
several fact issues precluded summary judgment.  The court determined that there were 
fact issues concerning whether the article as a whole and several specific 
passages in the article were false and disparaging.  49 S.W.3d at 621-22.  The court agreed with Forbes=s 
contention that, to recover on their business disparagement claims, the 
plaintiffs were required to satisfy the constitutional actual-malice standard 
the United States Supreme Court established in New York Times v. 
Sullivan, 376 U.S. 254 (1964), but held that a fact issue on Forbes=s 
state of mind at the time of publication precluded summary judgment.  We hold that GBI and GFC presented no evidence 
of actual malice under the New York Times standard, and thus reverse the 
court of appeals= 
judgment.
II
To 
prevail on a business disparagement claim, a plaintiff must establish that (1) 
the defendant published false and disparaging information about it, (2) with 
malice, (3) without privilege, (4) that resulted in special damages to the 
plaintiff.  Hurlbut v. Gulf Atl. 
Life Ins. Co., 749 S.W.2d 762, 766 (Tex. 1987).  A business disparagement claim is 
similar in many respects to a defamation action.  Id.  The two torts differ in that defamation 
actions chiefly serve to protect the personal reputation of an injured party, 
while a business disparagement claim protects economic interests.  Id.  In Hurlbut, a suit brought by an insurance agent against 
his former employer, we noted that a business disparagement defendant may be 
held liable Aonly 
if he knew of the falsity or acted with reckless disregard concerning it, or 
if he acted with ill will or intended to interfere in the economic interest 
of the plaintiff in an unprivileged fashion.@   Id.  (emphasis added) (quoting Restatement (Second) of Torts ' 
623A, cmt. g (1977)).  


The 
court of appeals noted in this case that GBI and GFC did not dispute Forbes=s 
contention that they were Apublic 
figures for the purpose of discussing their respective financial statuses,@ 
a conclusion that GBI and GFC do not challenge here.  49 S.W.3d at 615 n.2.  The court then held that ill will or 
intent to interfere with the plaintiff=s 
economic interest will not suffice to establish malice in a business 
disparagement claim brought by a public figure against a media defendant.  Id. at 618.  Instead, the court held that the 
constitutional interests at stake B 
Athe 
conflict between constitutionally-protected free expression and a state=s 
power to award damages based on a defendant=s 
statements@B 
require proof of actual malice under the standard the United States Supreme 
Court articulated in New York Times.  Id. at 618.   Accordingly, the court held that 
GFC and GBI must establish 
that Forbes published the article with knowledge that it made false statements 
about them, or with reckless disregard as to the statements= 
truth.  Id.  In this Court, GBI and GFC do not challenge the 
court of appeals= 
application of the constitutional malice standard.  We thus assume without deciding that the 
New York Times actual-malice standard applies in a public figure=s 
business disparagement suit against a media defendant.[3] 

III  


The 
actual malice standard articulated in New York Times fortifies our 
Constitution=s 
guarantees of free speech and a free press.  New York Times, 376 U.S. at 
254.  The relatively demanding 
standard honors our Aprofound 
national commitment to the principle that debate on public issues should be 
uninhibited, robust, and wide-open, and that it may well include vehement, 
caustic, and sometimes unpleasantly sharp attacks@ 
on public figures.  New York 
Times, 376 U.S. at 270.  The 
standard recognizes that Aerroneous 
statement is inevitable in free debate, and . . . it must be protected if the 
freedoms of expression are to have the >breathing 
space= 
that they >need 
. . . to survive.=@  Id. at 271 (quoting N.A.A.C.P. v. Button, 371 U.S. 415, 433 
(1963)).  Thus, public figures 
cannot recover for damaging statements made about them absent proof of actual 
malice.  New York Times, 376 
U.S. at 279-80;  WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 
(Tex. 1998). 


Actual 
malice, in this context, Ais 
a term of art.@  It is not ill will, spite, or evil 
motive.  Huckabee v. Time Warner, 19 S.W.3d 413, 420 
(Tex. 2000) (citing Casso v. Brand, 776 
S.W.2d 551, 558 (Tex. 1989)).  
Instead, Aactual 
malice@ 
requires proof that the defendant made a statement A>with 
knowledge that it was false or with reckless disregard of whether it was true or 
not.=@ 
 Huckabee, 19 S.W.3d at 420 (quoting New York 
Times, 376 U.S. at 279-80).  To 
establish reckless disregard, a public-figure plaintiff must prove that the 
defendant A>entertained 
serious doubts as to the truth of his publication.=@  Huckabee, 19 S.W.3d at 420 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).  Reckless disregard is a subjective 
standard, focusing on the defendant=s 
state of mind.  Bentley v. Bunton, 94 S.W.3d 561, 591 (Tex. 2002).  Mere negligence is not enough.  Id.  Rather, the plaintiff must establish 
A>that 
the defendant in fact entertained serious doubts as to the truth of his 
publication,=@ 
or had a A>high 
degree of awareness of . . . [the] probable falsity=@ 
of the published information.  
Id.  (quoting Harte-Hanks Comm., Inc. v. Connaughton, 491 U.S. 657, 688 (1989)).  Constitutional malice generally consists 
of A>[c]alculated falsehood.=@ 
Bunton, 94 S.W.2d at 591 (quoting Garrison 
v. Louisiana, 379 U.S. 64, 75 (1964)).  
When the defendant=s 
words lend themselves to more than one interpretation, the plaintiff must 
establish either that the defendant knew that the words would convey a 
defamatory message, or had reckless disregard for their effect.  See Bunton, 94 S.W.3d at 603.  
Actual 
malice must be proved by clear and convincing evidence at trial.  Huckabee, 19 S.W.3d at 420.  However, we have declined to adopt the 
clear-and-convincing standard for summary judgment purposes, because its 
application would Asuggest[] 
that the trial court must weigh the evidence.@  Id. at 421-22.  Accordingly, Forbes was entitled to 
summary judgment unless the record reveals a fact issue as to actual malice.
IV


In 
its no-evidence summary judgment motion, Forbes asserted that there was no 
evidence of actual malice to support the plaintiffs= 
claims.  See Tex. R. Civ. P. 
166a(i).  
In reviewing a no‑evidence summary judgment motion, we examine the record 
in the light most favorable to the nonmovant; if the 
nonmovant presents more than a scintilla of evidence 
supporting the disputed issue, summary judgment is improper.  King Ranch v. Chapman, 118 S.W.3d 
742, 750 (Tex. 2003); Wal‑Mart Stores, Inc. v. Rodriguez, 92 S.W.3d 502, 
506 (Tex. 2002).  A no-evidence 
summary judgment is improper if the respondent brings forth more than a 
scintilla of probative evidence to raise a genuine issue of material fact.  Tex. R. Civ. 
P. 166a(i); Wal-Mart, 92 S.W.3d at 
506.  ALess 
than a scintilla of evidence exists when the evidence is >so 
weak as to do no more than create a mere surmise or suspicion= 
of a fact.@ 
King Ranch, 118 S.W.3d at 751 (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).  More than a scintilla of evidence exists 
if it would allow reasonable and fair-minded people to differ in their 
conclusions.  King Ranch, 118 
S.W.3d. at 751 (citing Merrell Dow Pharms., Inc. v. 
Havner, 953 S.W.2d 706, 711 (Tex. 1997)).   Thus, if GBI and GFC presented evidence 
creating more than a surmise or suspicion that Forbes published the article with 
actual malice, summary judgment is improper.  The court of appeals concluded that fact 
issues about Forbes=s 
state of mind at the time of publication precluded summary judgment.  49 S.W.3d at 627.  We disagree.
A


The 
court of appeals rested its decision, in large part, on evidence suggesting that 
Barrett misled Eller into believing that he would have an opportunity to review 
the article for accuracy before its publication.  49 S.W.3d at 626.  In his affidavit, Eller stated that when 
Barrett first contacted him about writing the article, Barrett agreed to let him 
review it before it was published.  
On Friday, October 25, 1991, Eller received a copy of Awhat 
[Barrett] said was a draft of the article.@  According to Eller, he read the article 
that day and telephoned Barrett, telling him that the article Acontained 
innumerable false statements and clearly misleading and false innuendos.@  Eller=s 
affidavit maintains that he was misled in the conversation into believing that 
the article could still be corrected, and that he told Barrett he would send him 
a letter identifying the purported inaccuracies as quickly as possible.  Eller transmitted the letter to a 
courier for delivery by late the next day.  
According to the court of appeals, this evidence Acreates 
a fact question as to Barrett=s 
state of mind at the time of publication, provided that the article was not 
published until after Barrett=s 
representation.@  Id. at 625 (emphasis added).  
The 
actual malice inquiry focuses on the defendant=s 
state of mind at the time of publication.  
See Bose Corp. v. Consumers Union of United 
States, Inc., 466 U.S. 485, 512 (1984).  It is undisputed, however, that the 
article had been Alocked 
up@ 
B  printed and mailed to subscribers B 
on October 21st, before Barrett=s 
October 25th conversation with Eller and before Forbes received Eller=s 
letter.  Nevertheless, the court of 
appeals held that the record presented a fact issue on malice A[b]ecause the summary judgment proof raises a question as to 
whether the October 25 conversation took place before the article was 
published.@  49 S.W.3d at 627 (emphasis added).  The court concluded that the 
conversation may have taken place before the article was published based on 
authority holding that, for limitations purposes, A>publication 
is complete on the last day of the mass distribution of copies of the printed 
matter.=@  Id. at 626 (quoting Holloway 
v. Butler, 662 S.W.2d 688, 692 (Tex. App.BHouston 
[14th Dist.] 1983, writ ref=d 
n.r.e.)).


The 
court of appeals erred in applying the Holloway limitations standard in 
this context.  Determining the date 
of an article=s 
publication for limitations purposes involves considerations entirely different 
from those that apply when gauging whether actual malice exists at the time of 
publication.  In Holloway, 
the plaintiff sued for libel based upon an article that appeared in Texas 
Monthly magazine.  662 S.W.2d at 
690.  Like most mass-media 
publishers, the defendant distributed its magazine through the mail and by 
private delivery in the month prior to the month indicated on the issue 
cover.  Accordingly, distribution of 
the March 1977 issue occurred on February 17 and 18, 1977.  By special order, though, some back 
issues were sold after February 22, 1977.  
Plaintiff filed suit on February 22, 1978.  In response to the defendant=s 
assertion of limitations, the plaintiff relied on the Amultiple-publication 
rule,@ 
which recognizes a new cause of action each time a copy of the allegedly 
libelous publication is sold.  
Noting that such a rule would allow stale claims, encourage multiple 
suits, and create a number of other problems, and recognizing that mass 
publication of a single defamatory statement constitutes, in effect, a single 
wrong, the court adopted what it referred to as the Asingle-publication 
rule.@  Id. at 691.  Under the court of appeals= 
articulation of that rule, publication is complete Aon 
the last day of the mass distribution of copies of the printed matter@ 
because A[i]t is that day when the publisher, editors and authors have 
done all they can to relinquish all right of control, title and interest in the 
printed matter.@  Id. at 692.  The court emphasized that defining 
publication in this manner Aprovides 
ample time for a diligent plaintiff to pursue a cause of action for libel and 
also allows full recovery for any damages suffered.@  Id.  


The 
single-publication rule=s 
definition of the publication date for limitations purposes is clearly designed 
to protect publishers from repeated liability based on old publications that 
might be reprinted or back ordered.  
See Robert D. Sack, Sack 
on Defamation: Libel, Slander, and Related Problems ' 
7.2 (2003).  It has nothing to do 
with determining the publisher=s 
state of mind at the time of publication.  
Applying the single-publication rule in this context could lead to 
virtually uncontrollable liability and potentially absurd results.  For example, a media defendant could be 
held liable for knowingly publishing false information even if it did not become 
aware of the error until the article has been printed and mailed to subscribers 
or otherwise  distributed.  Such a result would have an 
impermissible A>chilling= 
effect . . . antithetical to the First Amendment=s 
protection of true speech on matters of public concern.@  Philadelphia Newspapers, Inc. v. 
Hepps, 475 U.S. 767, 778 (1986) (holding that 
application of state law that did not require private media defamation defendant 
to prove falsity violated First Amendment).  Moreover, the focus of the actual-malice 
inquiry is the defendant=s 
state of mind during the editorial process.  See Herbert v. Lando, 441 U.S. 153 (1979).  Evidence concerning events after an 
article has been printed and distributed, has little, if any, bearing on that 
issue.  Because the Forbes article 
was printed and in distribution before Eller=s 
October 25th conversation with Barrett,  
the conversation cannot constitute evidence of actual malice at the time 
of publication.
B
During 
Barrett=s 
October 25th conversation with Eller, he acknowledged that he had that day 
become aware that he had misidentified the Edward Bass that had sued one of the 
Granada entities.[4]  GBI and GFC argue that this constitutes some evidence of actual 
malice.  For the same reason that 
any misleading statements Barrett may have made in the October 25th conversation 
are no evidence of malice, his acknowledgment that he had become aware of the 
Bass error that day is no evidence of actual malice.
C


Finally, 
the plaintiffs contend that the article made a number of negative statements 
about AGranada@ 
that Forbes was aware were untrue as to GFC and GBI.  By failing 
to specifically distinguish the public corporations from other entities within 
the Granada group, they argue, Forbes knowingly or recklessly juxtaposed true 
statements to create the misleading impression that they applied to GFC and GBI.  They argue that Barrett=s 
affidavit itself provides some evidence of malice because he testified that he 
used the term AGranada@ 
to describe Athe 
organization of subsidiaries, affiliates, limited partnerships, joint ventures 
and other business organizations that were managed or otherwise under the 
direction and control of David Eller,@ 
a group that includes GFC and GBI.  Because 
Barrett also testified that certain of the generic Granada references were not 
intended to apply to GBI or GFC, the plaintiffs maintain that the article is admittedly 
false with respect to those statements.  
In essence, the plaintiffs contend that Forbes should have included 
qualifying language specifically excluding GBI and 
GFC whenever the article referred to AGranada.@
Read 
fairly, Barrett=s 
affidavit establishes, at most, that Forbes was A>guilty 
of using imprecise language in the article B 
perhaps resulting from an attempt to produce a readable article.=@  Bose, 
466 U.S. at 492 (quoting Bose Corp. v. 
Consumers Union of United States, Inc., 692 F.2d 189, 197 (1st 
Cir. 1982)).  Both we and the United 
States Supreme Court have repeatedly held that a media defendant=s 
poor choice of words or content, without more, does not amount to actual 
malice.


In 
Turner v. KTRK Television, Inc., 38 S.W.3d 103 
(Tex. 2000), for example, we considered a political candidate=s 
contention that a television news story suggesting that he had participated in a 
multi-million dollar insurance scam defamed him.  Turner had drafted a will for a man 
named Foster shortly before Foster disappeared under suspicious 
circumstances.  Foster, the target 
of several criminal investigations, signed the will three days before he was 
reported to have drowned.  
Foster=s 
life had been insured for more than $1.7 million, and American authorities 
learned some time later that he was alive in a Spanish prison.  KTRK, a 
Houston television station, broadcast a story about the connection between 
Turner and Foster in the midst of Turner=s 
campaign for mayor of Houston.  The 
story omitted several critical contextual facts and juxtaposed others in a 
misleading manner in the course of suggesting that Turner had engaged in 
unethical conduct.  We therefore 
held that the broadcast as a whole conveyed a false and defamatory message.  Id. at 119.  But we rejected Turner=s 
contention that the story=s 
discussion of the timing of his work on the will was evidence of actual 
malice.  Id. at 121.  We agreed that a reasonable viewer could 
take the segment to mean that ATurner 
>drew 
up= 
the will three days before Foster disappeared.@  Id.  But we concluded that even obviously 
misleading statements, without more, were not enough to constitute clear and 
convincing evidence of actual malice:  


We 
agree that there was a discrepancy in the segment=s 
language and that it is possible that [the reporter] cleverly manipulated this 
language to deceive viewers.  But it 
is equally possible that [the reporter] simply failed to choose his words with 
proper precision, that is, by stating that Foster Adrew 
up@ 
rather than Asigned@ 
the will (outside of Turner=s 
presence) three days before he disappeared.  Because there is no other evidence that 
[the reporter] knew or strongly suspected that this segment would mislead 
viewers, its lack of clarity alone is not clear and convincing evidence of 
actual malice.
 

Id. 
at 121-22.


In 
Huckabee, we affirmed summary judgment granted 
to a media defamation defendant that had been sued for statements in a 
documentary about four southeast Texas cases in which family courts granted 
custody of a child to the father after the mother accused him of child 
abuse.  Huckabee, 19 S.W.3d at 417.  One of the judges who presided over two 
of the custody disputes sued Time-Warner, alleging that the documentary omitted 
key information in an effort to depict him as biased or corrupt.  We acknowledged that a publisher might 
present such an incomplete or unbalanced picture of the facts as to constitute 
evidence of actual malice.  
Id. at 426.  On the 
facts of that case, however, we held that the record presented no evidence of 
actual malice, even though the story might have been misleading:

Although 
the facts omitted might or might not have led a reasonable viewer to suspend 
judgment or even to reach an opposite conclusion regarding Judge Huckabee=s 
order, their omission did not grossly distort the story.  At most, HBO=s 
failure to capture accurately all the story=s 
details suggests an error in judgment, which is no evidence of actual 
malice.
 

Id.  
Similarly, 
in Bose, the Supreme Court considered a 
manufacturer=s 
claim that a Consumer Reports article describing a new Bose speaker system disparaged the product.  The district court had ruled that the 
article falsely stated as fact that Ainstruments 
heard through the Bose system >tended 
to wander about the room,=@ 
and rendered judgment for Bose, the manufacturer.  Bose, 
466 U.S. at 488.  Applying the 
New York Times= 
actual-malice standard, the Supreme Court rendered judgment for the 
publisher.  The Court observed that 
the circuit court correctly concluded Athat 
there is a significant difference between proof of actual malice and mere proof 
of falsity.@  Id. at 511 (citations 
omitted).  The district court had 
found that the writer=s 
actual perception was that sound moved Aalong 
the wall@ 
rather than Aabout 
the room.@  Id.  Nevertheless, the Court held that the 
writer=s 
choice of language, 


though 
reflecting a misconception, does not place the speech beyond the outer limits of 
the First Amendment=s 
broad protective umbrella . . . .  
The statement in this case represents the sort of inaccuracy that is 
commonplace in the forum of robust debate to which the New York Times 
rule applies . . . .  ARealistically, 
. . . some error is inevitable; and the difficulties of separating fact from 
fiction convinced the Court in New York Times [and other cases] to limit 
liability to instances where some degree of culpability is present in order to 
eliminate the risk of undue self-censorship and the suppression of truthful 
material.@  
 

Id. 
at 513 (citations omitted). 
Here, 
Barrett was charged with the task of producing a readable article about an 
extremely complicated network of business entities related to the Granada 
Corp.  While it would have been more 
accurate for Forbes to identify the precise entities within that group to which 
it was referring, Forbes=s 
careless use of the generic AGranada@ 
is no evidence that Forbes entertained serious doubts as to the statements= 
truth or had a high degree of awareness of their falsity.  See Turner, 38 S.W.3d at 
121.  
V
The 
record before us presents no evidence that Forbes published defamatory 
statements about GBI and GFC 
with actual malice.  Accordingly, we 
reverse the court of appeals= 
judgment and render judgment that the plaintiffs take nothing.
 
 
 

__________________________________________

Harriet 
O=Neill

Justice

 
OPINION 
DELIVERED:  December 19, 2003
 
Appendix: 
Forbes article
 




[1]  The 
article is attached as an Appendix to this opinion. 

[2]  The 
Amarillo court affirmed the summary judgment as to all claims against Munke, and she is no longer a party.  Granada Biosciences, Inc., 958 
S.W.2d at 222.  It also affirmed the 
summary judgments as to the Ellers= claims.  
Id. at 222-25.

[3]  We note, 
however, that the United States Supreme Court has  applied the New York Times 
standard in contexts other than defamation, applying it to an intentional 
infliction of emotional distress claim, Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988), and to a product 
disparagement claim, Bose Corp. v.  Consumers Union of United States, 
Inc., 466 U.S. 485, 511-14 (1984).  


[4] The error was corrected in a later issue of the 
magazine.