COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-069-CV
 
 
THE 
HEARST CORPORATION                                                APPELLANTS
D/B/A 
THE HOUSTON
CHRONICLE 
PUBLISHING
COMPANY, 
AND EVAN MOORE
 
V.
 
JACK 
SKEEN, JR., DAVID                                                       APPELLEES
E. 
DOBBS, AND ALICIA CASHELL
 
------------
 
FROM 
THE 43RD DISTRICT COURT OF PARKER COUNTY
 
------------
 
OPINION ON REHEARING
 
------------
        After 
reviewing Appellants’ motion for rehearing and rehearing en banc and 
Appellees’ motion for rehearing, we deny the motions. We withdraw our February 
5, 2004 opinion and judgment and substitute the following.
        Appellees 
filed this libel cause of action seeking damages incurred from an allegedly 
defamatory article written by Appellant Evan Moore (Moore) and published in the Houston 
Chronicle, a newspaper published by the other Appellant, the Hearst 
Corporation. Appellants filed a motion for summary judgment seeking to dispose 
of Appellees’ entire case, which the trial court denied. Appellants now bring 
this interlocutory appeal from the trial court’s denial of their motion for 
summary judgment.[1]
I. 
Statement of Facts
        Appellees 
brought this libel action seeking damages caused by an article in the Houston 
Chronicle regarding the Smith County judicial system, specifically the 
District Attorney’s (D.A.) office. The article specifically names eight 
different criminal cases tried in Smith County involving allegations of 
misconduct during the period of 1970–2000.  About half of the cases 
discussed in the article were tried prior to current D.A. Jack Skeen’s (Skeen) 
tenure.
        The 
article at issue, entitled “Justice Under Fire,” was authored by Moore and 
edited by Kit Frieden (Frieden). It appeared in the Houston Chronicle on 
June 11, 2000, and was accompanied by several captioned photographs, 
subheadings, and three companion articles. The introductory subheading states, 
“‘Win at all costs’ is Smith County’s rule, critics claim.” The 
article begins with a discussion of the statue of the Greek goddess, the Lady of 
Justice, located at the entrance of the Smith County Courthouse. The statue, as 
the article points out, is missing the customary blindfold that is said to 
illustrate that justice is blind.
        The 
case of Kerry Max Cook, which the article states is “the most egregious, 
documented case of prosecutorial misconduct in the history of the state,” 
ignited Moore’s focused research into cases involving similar prosecutorial 
misconduct claims. For more than five months, Moore researched and reviewed 
court documents and interviewed parties involved in the eight cases that met his 
“prosecutorial misconduct” criteria. He also interviewed many defense 
attorneys and a judge that were not involved in these cases.
        Because 
Moore found some cases that were overturned due to prosecutorial misconduct, the 
article portrays the Smith County D.A. as having a win-at-all-costs policy. The 
article states that the misconduct in the D.A.’s office includes withholding 
exculpatory evidence, planting evidence, encouraging perjury, and selective 
prosecution. Appellees Skeen, David Dobbs (Dobbs), and Alicia Cashell (Cashell), 
who are all specifically named in the article, claim the article is false and 
malicious and sought damages for libel.
        Appellants 
filed a motion for summary judgment. The trial court denied the motion, finding 
genuine issues of material fact. Appellants raise four issues on appeal, arguing 
that the trial court erred by finding there were genuine issues of material fact 
about whether: (1) Appellants acted with actual malice; (2) the article taken 
statement by statement and as a whole was literally and substantially untrue; 
(3) the article was protected by constitutional, statutory, and common-law 
rights and privileges; and (4) the article was defamatory and was “of and 
concerning” Appellees. Because the trial court did not err, we affirm the 
trial court’s order. We remand to the trial court for a determination of the 
costs and reasonable attorney's fees of this appeal.[2]
II. 
Legal Analysis
A. 
Standard of Review
        Summary 
judgment is reviewed in public figure defamation cases under the same standard 
as other cases.[3]  In a summary judgment case, 
the issue on appeal is whether the movant met his summary judgment burden by 
establishing that no genuine issue of material fact exists and that the movant 
is entitled to judgment as a matter of law.[4]  
The burden of proof is on the movant, and all doubts about the existence of a 
genuine issue of material fact are resolved against the movant.[5]  
Therefore, we must view the evidence and its reasonable inferences in the light 
most favorable to the nonmovant.[6]
        In 
deciding whether there is a material fact issue precluding summary judgment, all 
conflicts in the evidence are disregarded and the evidence favorable to the 
nonmovant is accepted as true. [7]  Evidence that 
favors the movant's position will not be considered unless it is uncontroverted.[8]  Summary judgment is proper only if the record 
establishes that the movant has conclusively proved all essential elements of 
the movant's defense as a matter of law.[9]  If 
the uncontroverted evidence is from an interested witness, it does nothing more 
than raise a fact issue unless it is clear, positive and direct, otherwise 
credible and free from contradictions and inconsistencies, and could have been 
readily controverted.[10]
        A 
defendant is entitled to summary judgment if the summary judgment evidence 
establishes, as a matter of law, that at least one element of a plaintiff’s 
cause of action cannot be established.[11]  The 
defendant as movant must present summary judgment evidence that negates an 
element of the plaintiff’s claim.[12]  Once 
the defendant produces sufficient evidence to establish the right to summary 
judgment, the burden shifts to the plaintiff to come forward with competent 
controverting evidence raising a genuine issue of material fact with regard to 
the element challenged by the defendant.[13]
        A 
defendant is entitled to summary judgment on an affirmative defense if the 
defendant conclusively proves all the elements of the affirmative defense.[14]  To accomplish this, the defendant-movant must 
present summary judgment evidence that establishes each element of the 
affirmative defense as a matter of law.[15]
B. 
Public Figure Defamation
        Defamation 
occurs when a false statement about a plaintiff is published to a third person 
without legal excuse, causing damages to the plaintiff’s reputation.[16]  Libel is defamation in written or other graphic 
form that tends to injure a person’s reputation, exposing the person to public 
hatred, contempt, or ridicule.[17]  To maintain 
a libel cause of action, the plaintiff must prove that the defendant (1) 
published a statement (2) that was defamatory concerning the plaintiff (3) while 
acting with either actual malice, if the plaintiff was a public figure, or 
negligence, if the plaintiff was a private individual, regarding the truth of 
the statement.[18]
1. 
Defamatory Meaning
        In 
their fourth issue, Appellants argue that the trial court erred by finding a 
genuine issue of material fact about whether the article is capable of a 
defamatory meaning “of and concerning” Appellees. We disagree.
        In 
a libel action, the court first must determine whether the statements made are 
reasonably capable of defamatory meaning.[19]  
If a publication is of ambiguous or doubtful import, the jury must determine its 
meaning.[20]  An allegedly defamatory 
publication should be construed as a whole, in light of the surrounding 
circumstances, based upon how it would be perceived by a person of ordinary 
intelligence.[21]  Under Texas law, even though 
all the article’s individual statements considered in isolation may be 
literally true or non-defamatory, a publication can convey an untrue and 
defamatory impression by omitting or juxtaposing facts.[22]  
Thus, whether a publication is false and defamatory depends on a reasonable 
person’s perception of the entirety of a publication and not merely on 
individual statements.[23]
        The 
article in this case begins its substantive discussion by addressing Skeen’s 
background, including his prior employment. The article continues:
 
He 
has a record for winning.  Honored as the State Bar’s Prosecutor of the 
Year for 1997, Skeen has been cited by a Sam Houston State University study 
showing that from 1980-90, Smith County led the state in meting out the longest 
prison sentences for major crimes and the second-longest for less violent 
offenses.
The 
question is how that record was achieved.
 
During 
the same period that Skeen’s enviable conviction record has been growing, 
Smith County has gained a reputation in select circles for inequity in state 
criminal cases. (emphasis added.)

 
        This 
portion implies that Skeen has a record of winning that was achieved by improper 
methods of prosecuting criminal cases, and that implication continues throughout 
the remainder of the article. Therefore, this opening portion of the article 
raises issues of material fact about the article’s defamatory meaning 
regarding Appellees.
        Additionally, 
the article specifically names Appellees as its subjects. Skeen is specifically 
named in the main article at least twenty times, Dobbs is named at least five 
times, and Cashell is named at least once. A photograph of Skeen with a caption 
implying misconduct accompany the text. Consistently throughout the article, 
Appellees are identified through pronouns such as “he,” “she,” or 
“they,” as well as “the State,” “the district attorney,” or “the 
prosecutor.” These references also raise an issue of material fact about the 
article’s defamatory meaning regarding Appellees.
        Likewise, 
Frieden’s testimony and the testimony of potential jurors also raise a genuine 
issue of material fact about whether the article has a defamatory meaning 
regarding Appellees. Frieden testified that a reasonable reader would infer from 
the article that Appellees engage in unethical activities in obtaining 
convictions. Potential jurors have also said the article was the reason they had 
a bias against the State. One potential juror in a case in which Cashell 
participated recognized Cashell’s name from the article and testified that 
because the article cited many instances of misconduct and a win-at-all-costs 
policy, she felt like the State would not be honest or fair.
        Consequently, 
because the more than two thousand pages of summary judgment evidence in this 
case raise multiple issues of material fact regarding the defamatory meaning of 
the article regarding Appellees, the trial court did not err by denying summary 
judgment on this issue. We overrule Appellants’ fourth issue.
2. 
Actual Malice
        In 
Appellants’ first issue, they argue that the trial court erred by finding that 
there was a genuine issue of material fact regarding whether Appellants acted 
with actual malice. We disagree.
        In 
this case, both sides agree that Appellees are public figures. Thus, as an 
element of their cause of action, Appellees must prove that Appellants acted 
with actual malice.[24]  The purpose of the 
actual malice standard is to protect innocent but erroneous speech on public 
issues, while deterring calculated falsehoods.[25]  
“Actual malice” for this cause of action occurs when a person makes a 
statement with knowledge that it is false, or with reckless disregard of whether 
it is true or not.[26]  Knowledge of falsehood 
is a relatively clear standard; reckless disregard is much less so.[27]  In this context, “reckless disregard” is a 
term of art requiring that the defendant in fact entertained serious doubts as 
to the truth of his statements at the time they were made.[28]  
It is a subjective standard that “focuses on the conduct and state of mind of 
the defendant.”[29]  “Likewise, recklessness 
may be found where there are obvious reasons to doubt the veracity of the 
informant or the accuracy of his reports.”[30]  
Additionally, an omission can be evidence of actual malice if the plaintiff 
proves that the defendant knew or strongly suspected that it could create a 
substantially false impression.[31]
        To 
disprove actual malice, a defendant may certainly testify about his own thinking 
and reasons for his actions, and he may be able to negate actual malice 
conclusively.[32]  The defendant, however, 
cannot automatically ensure a favorable verdict by testifying that he published 
an article with a belief that the statements were true.[33]  
“[H]is testimony that he believed what he said is not conclusive, irrespective 
of all other evidence. The evidence must be viewed in its entirety.”[34]
        Although 
the focus is on the defendant’s state of mind, a plaintiff can prove actual 
malice through circumstantial evidence.[35]  
Even though a lack of care or an injurious motive in making a statement by 
itself is not proof of actual malice, care and motive are factors to be 
considered.[36]  For example, a failure to 
investigate fully is not evidence of actual malice, but a failure to investigate 
motivated by a desire to avoid the truth, is purposeful avoidance.[37]  And an understandable misinterpretation of 
ambiguous facts does not show actual malice, but inherently improbable 
assertions and statements made on information that is obviously dubious can show 
actual malice.[38]
        In 
this case, Appellees produced sufficient circumstantial evidence to raise an 
issue of fact regarding Appellants’ reckless disregard. Although Moore spent 
about six months doing research for the article, he did not try to speak to 
Appellees until two weeks before the article’s scheduled publication. When 
Moore finally did meet with Appellees, only days before the article was due, he 
told Skeen that he was writing an article that was “critical” of Skeen’s 
office. Moore spent not more than a couple of hours, collectively, with 
Appellees and did not discuss many of the substantive issues in the article. 
This evidence of his failure to fully investigate and get Appellees’ response 
to the charges he made against them raises a material issue of fact about 
whether Moore’s behavior was “purposeful,” and, thus, whether the article 
was published with actual malice.
        After 
the meeting, but before the article was published, Appellees sent a letter to 
Appellants addressing their concerns about the article’s bias against them, 
the false or incomplete information, and the credibility of Moore’s primary 
informants. Appellants admitted that the letter “perturbed” them and led 
them to consider whether additional information should be added to the article. 
Nonetheless, the text of the published article was the same as the version of 
the article before Appellants received the letter, except for the insertion of 
one three-sentence paragraph, which Frieden added. Therefore, material facts 
exist as to whether Appellants recklessly disregarded the information obtained 
from Appellees just to meet a publication deadline that easily could have been 
extended.
        In 
addition, Appellees presented evidence of a material fact issue about whether 
Moore knew there was not a win-at-all-costs rule or policy in the Smith County 
D.A.’s office. He testified that he knew a “rule” means an action occurs 
more often than not, and a “policy” is more than a happenstance. Moore 
admitted, however, that he was only aware of “problems” alleged in .04% or 
four out of every ten thousand cases, and he admitted that at the time of 
publication he had found mistakes in only three cases. In fact, Moore admitted 
that no case tried by Skeen’s office has been reversed for a discovery 
violation.
        Furthermore, 
Moore’s primary source in the article admits that he alleged discovery 
problems in only a small percentage of his cases. This source admits that he is 
not an objective source; he always resolves doubts about facts in favor of his 
client. Moore was aware of this informant’s bias and limited sample of 
problems and allegedly expressed doubts about the veracity of the informant or 
reliability of his reports. We conclude that an issue of material fact exists 
about whether Moore recklessly disregarded this information and published the 
article anyway.
        Additionally, 
circumstantial evidence raises material issues of fact regarding Appellants’ 
purposeful avoidance of the truth. The article states that “Skeen’s office 
is so driven toward convictions that his 30 assistants are required to file a 
written report if they lose a case;” however, Moore admits that he never 
requested a copy of the D.A.’s written policies, and that he was aware that 
his informant knew there was really no policy to this effect. The article also 
states that Moore’s informant Brendan Baade “apparently has filed more 
motions attacking the district attorney’s evidence policies than any other 
Tyler attorney. . . . Most of Baade’s motions have been successful.” 
However, Moore testified that he has no idea how many motions are filed 
attacking the D.A.’s discovery policies nor does he know how many different 
attorneys have filed motions. He also does not know how many of Baade’s 
motions are actually successful on the basis of an evidentiary issue. Baade also 
testified that he has no idea how many motions he has filed alleging discovery 
violations; however, he does admit that he has alleged discovery violations in 
only a small percentage of his cases.
        Moore 
testified that he spoke to at least ten defense attorneys and a judge who told 
Moore that Skeen’s office does not have a rule, policy, or pattern of 
misconduct, and that only a few defense attorneys agreed with the implications 
the article implied. Moore admitted that he did not seek interviews with any 
attorneys who might have an opposite view of the D.A.’s office than he did. An 
expert testifying about the standard for adequately reporting information 
testified that this article fell far below that standard. The expert testified 
that the article was biased and failed to impartially give an accurate and 
balanced account of the information presented in the article. These facts 
therefore raise issues of material fact as to whether Moore purposefully avoided 
the truth.
        Because 
the evidence raises issues of material fact as to whether Appellants acted with 
actual malice because they knew the article was false but recklessly disregarded 
or purposefully avoided the truth, the trial court did not err in denying 
summary judgment on this issue. Appellant’s first issue is overruled.
C. 
Substantial Truth Doctrine
        In 
Appellants’ second issue, they argue that the court erred in denying the 
motion for summary judgment because the article was substantially true. We 
disagree.
        Substantial 
truth is an affirmative defense to a defamatory claim, and the Appellees bear 
the burden of proof on this issue.[39]  A 
statement is substantially true, and thus not actionable, if its “gist” or 
“sting” is not substantially worse than the literal truth.[40]  
Thus, liability is found if a publication gets the details right, but fails to 
put them in the proper context; thereby getting the story’s “gist” wrong.[41]  This evaluation requires us to determine whether, 
in the mind of the average person who read the article, the allegedly defamatory 
article was more damaging to the plaintiff’s reputation than a truthful 
article would have been.[42]  In determining 
whether an article is true or substantially true, we must look at it in light of 
the surrounding circumstances.[43]
        Under 
this standard, we hold that Appellants have failed to establish the substantial 
truth of the article as a matter of law. Implying that there is a rule or policy 
of misconduct in the Smith County D.A.’s office, the article specifically 
discusses eight cases: Beddingfield, Smith, Mims, Payne, 
Butler, Mitchell, Cook, and Bendy, in which 
prosecutorial misconduct allegedly occurred.  Of these cases reported by 
Moore in support of the allegations that the Smith County D.A.’s office has a 
rule, policy, and pattern of misconduct, at least half of them began before 
Skeen took office.  Nevertheless, the article essentially merges Skeen’s 
tenure with his predecessors’ and falsely attributes the misconduct of his 
predecessors to Skeen.  Additionally, as set forth below, issues of 
material fact exist regarding the substantial truth of the Beddingfield, Smith, 
and Mims discussions implying selective prosecution, the Payne 
discussion implying general prosecutorial misconduct, the Butler, Mitchell, 
and Cook discussions implying suppression of exculpatory evidence, and 
the Bendy discussion implying encouragement to commit perjury.
        First, 
the article states, “[o]ur district attorney is closely allied with police 
officers and it’s the only county I know where, if you want to settle a case, 
you talk to the arresting officer first, not the DA,” and “Skeen doesn’t 
deny his ties to law enforcement.”  The article discusses two cases 
involving law enforcement officers.  The article refers to a drug sweep in 
the late 1970s (prior to Skeen taking office), “in which two rogue narcotics 
officers lied and planted evidence to make more than a hundred cases, resulted 
in embarrassment to the county and prison sentences for the narcotics 
officers.”  Thereafter, the article refers to the Beddingfield 
case stating:
 
Recently, 
when Smith County Sheriff’s Lt. David Beddingfield, son of the chief deputy, 
was accused of drug violations, Skeen recused his office from the investigation, 
citing a ‘close working relationship’ with the sheriff’s office.
Instead, 
a prosecutor was called in from the Texas Attorney General’s Office to work 
with a grand jury investigating the case.
 
 
        Implying 
“selective prosecution,” the article continues with the following quote from 
a former D.A. and current defense attorney, “I don’t know how you avoid 
prosecuting police officers . . . I prosecuted several when I was DA.” 
Omitted, however, from the article are the facts surrounding Skeen’s decision 
to refer the case to the Attorney General’s (A.G.) office. At the time 
Beddingfield was accused, as a part of the violent crimes task force, he was a 
primary witness in many ongoing homicide cases. Because of this conflict, Skeen 
and Dobbs contacted the division of the A.G.’s office that exists specifically 
to handle this type of problem. After discussing the situation, the A.G. agreed 
that it was proper to refer the case to him to avoid an appearance of 
impropriety. These factual omissions regarding the circumstances involved in 
Skeen’s decision to refer the case to the A.G.’s office present a material 
issue of fact regarding the substantial truth of the article.
        Additionally, 
the Smith case is referred to in the lead article as, “A case in which 
a civil lawsuit became a felony theft case and a Tyler businessman was kept 
under perpetual, repeated indictment for four years before making his own, 
unsolicited appearance before a grand jury when he finally was no-billed.” The 
companion article explains that “Smith, however, believes he was targeted by 
KLTV because of a longstanding business rivalry between himself and the station; 
he believes he was targeted by Skeen because of a close relationship between the 
district attorney and KLTV,” and “[i]n all, he was indicted three times for 
a crime that has yet to be explained. Finally, after Smith sued the car dealer 
and KLTV for false prosecution and received a $3.2 million settlement, the 
indictments stopped.”
        The 
charges, however, arose when the car dealer’s attorney approached the D.A.’s 
office alleging that Smith was engaged in illegal activity. The attorney 
received no special treatment, but was referred to the police department as was 
normal procedure. The police investigation turned up enough information to send 
the case to the grand jury in 1989.  A note in the original file indicates 
that Smith was afforded the opportunity to testify at the first grand jury, but 
the article implies that he was only allowed to testify in the fourth grand jury 
presentation.  The article fails to point out that the fourth grand jury 
was convened at Smith’s request to provide the deposition testimony taken in 
1993, and thus not available for the prior grand juries. Although these facts 
were absent from the article, Moore was aware of them when he published the 
article.
        The 
lead article also addressed the Mims case, stating it was “[a]n 
aggravated assault case in which evidence that the state’s main witness had 
multiple accusations of child molestation against her was suppressed until it 
was learned of by accident by a defense attorney.”  Although the 
Appellants claim that this recitation is true, it is actually only Baade’s 
allegations.  In deposition testimony, Moore characterized the information 
that he received from Baade as speculation, and he admits that he was provided 
no evidence to support this speculation.
        Before 
publishing the article, Moore knew that Dobbs had informed Baade before the 
witness testified in Mims that one of the defendant’s relatives was 
accusing the witness of criminal acts, and Baade indicated that it was “not 
any big deal.”  In the habeas corpus hearing, the court found that Baade 
was informed of the accusations, and there was no formal charge against the 
witness at the time of the trial.  But the companion article suggests that 
both the presence of Skeen at the Mims trial and “the gravity of the 
charges” were due to the “influence” and prominence of the victim’s 
father. Furthermore, the article states that “[i]n Smith County what counts is 
who you are, who your lawyer is and what you’ve done for the DA’s office 
lately.” Issues of material fact exist regarding the substantial truth of the 
article because Moore admits that he does not believe this statement to be true.
        Next, 
the article also raises issues of material fact regarding the article’s truth 
by implying prosecutorial misconduct in the Payne case. The article 
juxtaposes that case, which was highly publicized due to a jury sentencing Payne 
to sixteen years for stealing a candy bar, with a comment about the verdict made 
by a prosecutor no longer with the D.A.’s office. Although a mistrial was 
granted in that case, it had nothing to do with any prosecutorial misconduct, 
but was granted solely because of jury misconduct. The article arguably states 
the true facts, however, the article creates a false gist that misconduct by the 
prosecutor was a reason for the mistrial.
        Then, 
the article raises issues of material fact regarding the article’s truth by 
implying suppression of exculpatory evidence.  The Butler case’s 
treatment in the article raises issues of material fact by presenting a false 
gist.  The case took place before Skeen’s tenure, and although Appellants 
argue that “[t]he article notes that the Butler case began before Skeen,” 
the article does not.  The only reference to Skeen with regard to the Butler 
case is that he joined Butler’s attorney in requesting a pardon.  A 
reasonable reader would infer that Skeen did something wrong and that was his 
reason for supporting the pardon.
        The 
true facts omitted from the article are that in a motion for DNA testing 
proceeding in 1999, the victim disclosed information that had never before been 
revealed; Dobbs disclosed that information to the defense attorney at that time.  
Furthermore, Butler made no allegation that the state suppressed exculpatory 
evidence or engaged in prosecutorial misconduct.
        The 
article misrepresents the facts of yet another case. Mitchell states that 
after Mitchell was freed because exculpatory evidence was withheld by the 
sheriff’s office, “last year” he sued the county and received $40,000.  
The article fails to point out that the evidence was withheld from Mitchell’s 
trial in1981, prior to Skeen’s tenure.  Appellants contend that the 
article clearly indicates that this case occurred before Skeen’s tenure.  
After the Mitchell references, however, the article states, “Skeen is 
quick to point out that all of those cases began before his first term in 1983.  
Still, the blame for them has bled over, and Skeen’s office is accused of 
policies that may have resulted in some of the same abuses as his 
predecessors.”  This statement suggests that although Skeen might not 
have been D.A. at the time of the original problem, he was involved in the 
misconduct.
        The 
Cook case, was also originally tried before Skeen’s tenure. Frieden 
concedes that a reasonable reader of the Cook discussion could interpret 
it as critical of Skeen.  The article refers to this case as “one of the 
better known examples of prosecutorial misconduct in the nation.”  The 
Court of Criminal Appeals, however, stated in its Cook opinion that 
“the acts of misconduct on the part of the Smith County District Attorney’s 
Office and the Tyler Police Department took place nearly twenty years ago and we 
do not imply any complicity in said acts on the part of the current District 
Attorney or current members of the Tyler Police Department.”[44]
        The 
article also suggests an inaccurate account of the timing of the DNA testing in Cook. 
The article implies that Skeen’s office knew the results of the DNA test prior 
to the plea agreement, when in fact the testing took place after the plea was 
entered. The State even attempted to obtain a continuance for the testing, but 
was opposed by the defense. Moore was aware of these facts but failed to include 
them in the article. The article’s gist raises issues of material fact about 
whether it falsely implies misconduct by Skeen, and therefore, whether the 
article is substantially true.
        Finally, 
the article also raises issues of material fact regarding the article’s truth 
by implying the D.A.’s office encourages perjury. The main article describes 
the Bendy case as “[a] child molestation case in which the victim and 
main witness, both minors, say they were told by a prosecutor [Cashell] to 
‘just say yes’ to her questions in court, despite the fact that they had 
attempted repeatedly to tell the prosecutor that the offense had not 
occurred.” The companion article explains that a new trial was granted. The 
article may mislead reasonable readers to conclude that the new trial was due to 
prosecutorial misconduct, and that Bendy is not guilty. The article omits any 
reference to the fact that the new trial was granted solely because the court 
failed to shuffle jurors, not because of any alleged prosecutorial misconduct. 
Moore admitted that he knew these facts, and admitted that Cashell, as well as 
others Moore spoke to, denied that she had told the witnesses to do anything but 
to tell the truth on the stand.
        As 
a result, jurors pooled after the article was published have testified that 
because the article implied that the D.A.’s office acts improperly, they were 
biased against the State and could not be fair and impartial fact finders. These 
comments raise issues of material fact that the article was more damaging to the 
Appellees’ reputation in the mind of an average reader than a truthful 
statement would have been.
        Therefore, 
the article as a whole raises genuine issues of material fact about whether the 
article is substantially true because it alleges a current rule, pattern, and 
policy of misconduct, and it casts more suspicion on Appellees’ actions than 
an accurate account would have warranted. Consequently, the trial court did not 
err by finding genuine issues of material fact about whether the article was 
substantially true. Appellant’s second issue is overruled.
D. Privilege
        In 
their third issue, Appellees argue that the trial court erred in finding a 
genuine issue of material fact about whether the article was protected by 
constitutional, statutory, and common-law rights and privileges. We disagree.
1. 
Common-Law
        There 
are two classes of privileges applicable to defamation cases, “absolute” 
privileges and “conditional or qualified” privileges.[45]  
Absolute privileges are thought of as immunities because they are based on the 
personal position or status of the actor.[46]  
These privileges only apply in limited situations involving the 
“administration of the functions of the branches of government, such as 
statements made during legislative and judicial proceedings.”[47]  The judicial proceedings privilege applies to 
communications made in the course of a judicial proceeding including any 
statement made by the judges, jurors, counsel, parties, or witnesses in open 
court, pre-trial hearings, depositions, affidavits, and any of the pleadings or 
other papers in the case.[48]  Although libelous 
statements made in connection with a judicial proceeding are absolutely 
privileged and will not serve as the basis of a civil action for libel or 
slander, regardless of the negligence or malice with which they are made, 
re-publication of such statements outside of the judicial context waives the 
privilege.[49]
        A 
conditional or qualified privilege arises out of the circumstances in which the 
allegedly false statement is published in a lawful manner for a lawful purpose.[50]  This privilege applies to bona fide statements 
made under circumstances where the author believes that the public has an 
important interest in a particular subject matter requiring publication, or 
where the author believes that a person having a common interest in a particular 
subject matter is entitled to know the information.[51]  
“A conditional or qualified privilege is defeated, however, when the privilege 
is abused, such as when the person making the defamatory statement knows the 
statement is false or acts for some purpose other than protecting the privileged 
interest.”[52]  Therefore, because a 
conditional or qualified privilege would be defeated by a finding of malice, and 
malice is a necessary element of a public figure defamation cause of action, the 
privileges are irrelevant here.[53]
        In 
this case, we do not decide whether any of the statements in the article fall 
within the common law “judicial proceedings” privilege because the privilege 
has been waived; all of the statements made in the article were 
“republished.” Additionally, because we find genuine issues of material fact 
regarding actual malice, Appellants did not prove that the article was protected 
by the common law conditional or qualified privilege as a matter of law. 
Consequently, the trial court did not err in denying Appellants summary judgment 
regarding common law privileges.
2. 
Constitutional
        The 
opinion and fair comment privileges are “constitutional privileges” that 
arise from limitations on the plaintiff’s cause of action imposed by the 
United States and Texas Constitutions.[54]  The 
privilege of opinion and fair comment grants legal immunity for the honest 
expression of opinion on matters of legitimate public interest when based upon a 
true or privileged statement of fact.[55]  The 
Texas Supreme Court has explained that Texas courts are bound by the U.S. 
Supreme Court’s holding in Milkovich; therefore, we must focus our 
analysis on a statement’s verifiability and the entire context in which it was 
made.[56]  Furthermore, whether a publication is 
an actionable statement of fact or a constitutionally protected opinion depends 
on a reasonable person’s perception of the entire publication, not merely the 
individual statements.[57]  The First Amendment 
provides protection for statements that cannot reasonably be interpreted as 
stating actual facts about an individual, and because the parties have not 
argued any difference in the state and federal constitutional protections we 
assume the Texas constitutional protection is the same.[58]
        “[T]he 
imputation of a corrupt or dishonorable motive in connection with established 
facts is itself to be classified as a statement of fact and as such not to be 
within the defense of fair comment.”[59]  And 
while a “word may be merely epithetic in the context of amorphous criticism, 
it may also be used as a statement of fact that can be proved true or false.”[60]  As the Supreme Court explained in Mikovich:
 
        If 
a speaker says, “In my opinion John Jones is a liar,” he implies a knowledge 
of facts which lead to the conclusion that Jones told an untruth. Even if the 
speaker states the facts upon which he bases his opinion, if those facts are 
either incorrect or incomplete, or if his assessment of them is erroneous, the 
statement may still imply a false assertion of fact. Simply couching such 
statements in terms of opinion does not dispel these implications; and the 
statement, “In my opinion Jones is a liar,” can cause as much damage to 
reputation as the statement, “Jones is a liar.” As Judge Friendly aptly 
stated: “[It] would be destructive of the law of libel if a writer could 
escape liability for accusations of [defamatory conduct] simply by using, 
explicitly or implicitly, the words ‘I think.’“ It is worthy of note that 
at common law, even the privilege of fair comment did not extend to “a false 
statement of fact, whether it was expressly stated or implied from an expression 
of opinion.”[61]

 
        We 
hold that taken as a whole, this article raises issues of material fact about 
whether it is capable of defamatory assertions of fact. Its overarching theme 
encompasses not only a harsh evaluation of Appellees’ performances but also an 
accusation that their allegedly dishonorable motives and actions amounted to 
prosecutorial misconduct. The accusatory language in the article includes 
statements such as the D.A.’s office is “tainted and inequitable;” the 
D.A. has “a win-at-all-costs policy” consisting of “suppressing 
evidence,” “planted evidence,” “encouraging perjury,” and 
“practicing selective prosecution;” there is “a pattern of lying, cheating 
and violations of the law by Smith County prosecutors that wouldn’t be 
tolerated in Harris or Dallas County or any of the other, larger offices in the 
state;” “[d]ishonesty is encouraged when it helps win convictions;” and 
that Smith County has “more innocent people in jail than any other county in 
the state.”
        Furthermore, 
to charge one falsely with the commission of any crime for which he may be 
punished by imprisonment is libel per se.[62]  
The article alleges many crimes that are punishable by imprisonment, for 
example, coercing false testimony;[63] lying, 
cheating and violating the law;[64] and suppressing 
and planting evidence.[65]  Although Appellants 
couch their accusation of this type of criminal prosecutorial misconduct in 
terms of a defense attorney’s opinion, such hedging does not mitigate the 
defamatory impact of a criminal accusation.[66]
        Furthermore, 
as explained in Milkovich, statements in the article such as: “I really 
thought the district attorney’s office was just as bound to seek the truth and 
justice as any other part of the judicial system, he said.  That’s not 
what they do here.  They don’t actually violate the law.  They 
manipulate it;” “It’s simply a pattern of lying, cheating and violations 
of the law by Smith County prosecutors that wouldn’t be tolerated in Harris or 
Dallas County or any of the other, larger offices in the state, said Nugent.  
Dishonesty is encouraged when it helps win convictions;” and “Our district 
attorney is closely allied with police officers and it’s the only county I 
know of where, if you want to settle a case, you talk to the arresting officer 
first, not the DA,” may not warrant constitutional protection merely because 
they are “opinion.”  Statements such as these, found throughout the 
article, are sufficient to raise genuine issues of material fact about whether 
the article is protected opinion.
        On 
this basis, we conclude issues of material fact exist about whether the article 
includes defamatory assertions of fact that are not constitutionally protected 
speech; thus, the trial court did not err by denying summary judgment on this 
issue.
3. 
Statutory
        Texas 
Civil Practice and Remedies Code section 73.002 grants a qualified privilege to 
media defendants that republish defamatory statements first raised in judicial 
proceedings, provided the statements are “fair, true, and impartial.”[67]  “To determine whether a media defendant’s 
account of a judicial proceeding is ‘fair and impartial,’ it must be 
interpreted in the sense that the ordinary reader would understand.”[68]  The media defendant must prove substantial truth 
to retain the privilege.[69]
        As 
explained above, Appellants did not establish the substantial truth of the 
accounts of the judicial proceeding in the article as a matter of law, thus, 
issues of material fact exist as to whether the statutory privilege applies in 
this case.[70]  Consequently, the trial court 
did not err in denying summary judgment on Appellants’ statutory privilege 
defense. Therefore, the Appellants did not prove as a matter of law that the 
article was protected by common law, constitutional, or statutory privilege. 
Appellant’s third issue is overruled.
III. 
Conclusion
        Because 
we have overruled each of Appellants’ issues, we affirm the trial court’s 
judgment. We remand to the trial court for a determination of the costs and 
reasonable attorney's fees of this appeal.[71]
 
 
                                                          LEE 
ANN DAUPHINOT
                                                          JUSTICE
 
 
PANEL 
B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.
DELIVERED: 
March 18, 2004

 
NOTES
1.  
See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(6) (Vernon Supp. 2004).
2.  
See Tex. Civ. Prac. & Rem. Code Ann. § 51.015 (Vernon 1997).
3.  
Huckabee v. Time Warner Entm’t Co., 19 S.W.3d 413, 423 (Tex. 2000); Fort 
Worth Star-Telegram v. Street, 61 S.W.3d 704, 708 (Tex. App.—Fort Worth 
2001, pet. denied).
4.  
Tex. R. Civ. P. 166a(c); S.W. Elec. Power Co. v. 
Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v. Clear Creek 
Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).
5.  
S.W. Elec. Power Co., 73 S.W.3d at 215; Rhone-Poulenc, Inc. v. 
Steel, 997 S.W.2d 217, 223 (Tex. 1999); Great Am. Reserve Ins. Co. v. San 
Antonio Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).
6.  
Great Am., 391 S.W.2d at 47.
7.  
Rhone-Poulenc, 997 S.W.2d at 223; Harwell v. State Farm Mut. Auto. 
Ins. Co., 896 S.W.2d 170, 173 (Tex. 1995).
8.  
Great Am., 391 S.W.2d at 47.
9.  
Clear Creek Basin, 589 S.W.2d at 678.
10.  
Tex. R. Civ. P. 166a(c); Trico Techs. Corp. v. 
Montiel, 949 S.W.2d 308, 310 (Tex. 1997).
11.  
Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999).
12.  
Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).
13.  
Id.
14.  
KPMG Peat Marwick v. Harrison County Hous. Fin. Corp., 988 S.W.2d 746, 
748 (Tex. 1999).
15.  
Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 121 (Tex. 1996).
16.  
Pisharodi v. Barrash, 116 S.W.3d 858, 861 (Tex. App.—Corpus Christi 
2003, no pet. h.); Reedy v. Webb, 113 S.W.3d 19, 23 (Tex. App.—Tyler 
2002, pet. denied); see also Newsom v. Brod, 89 S.W.3d 732, 735–36 
(Tex. App.—Houston [1st Dist.] 2002, no pet.).
17.  
Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 1997).
18.  
WFAA-TV, Inc. v. McLemore, 978 S.W.2d 568, 571 (Tex. 1998); Fort Worth 
Star-Telegram, 61 S.W.3d at 709; New Times, Inc. v. Wamstad, 106 
S.W.3d 916, 921 (Tex. App.—Dallas 2003, no pet. h.).
19.  
See Turner v. KTRK Television, Inc., 38 S.W.3d 103, 114 (Tex. 2000).
20.  
Id.
21.  
Id.
22.  
Id.
23.  
Id. at 115.
24.  
E.g., New Times, 106 S.W.3d at 921.
25.  
Turner, 38 S.W.3d at 120; New Times, 106 S.W.3d at 925.
26.  
Bentley v. Bunton, 94 S.W.3d 561, 591 (Tex. 2002); Turner, 38 
S.W.3d at 120; Carr v. Brasher, 776 S.W.2d 567, 571 (Tex. 1989).
27.  
Bentley, 94 S.W.3d at 591.
28.  
Id.
29.  
Id.
30.  
Id. at 596.
31.  
Turner, 38 S.W.3d at 121.
32.  
Bentley, 94 S.W.3d at 596.
33.  
Id.
34.  
Id.
35.  
Turner, 38 S.W.3d at 120.
36.  
Bentley, 94 S.W.3d at 596.
37.  
Id.
38.  
Id.
39.  
UTV of San Antonio, Inc. v. Ardmore, Inc., 82 S.W.3d 609, 610 (Tex. 
App.—San Antonio 2002, no pet.).
40.  
Turner, 38 S.W.3d at 115; Gustafson v. City of Austin, 110 S.W.3d 
652, 656 (Tex. App.—Austin 2003, pet. denied); Scripps Tex. Newspapers, 
L.P. v. Belalcazar, 99 S.W.3d 829, 835 (Tex. App.—Corpus Christi 2003, 
pet. denied); UTV of San Antonio, 82 S.W.3d at 611.
41.  
Turner, 38 S.W.3d at 115.
42.  
Gustafson, 110 S.W.3d at 656; Scripps Tex. Newspapers, 99 S.W.3d 
at 835; UTV of San Antonio, 82 S.W.3d at 611.
43.  
Gustafson, 110 S.W.3d at 656.
44.  
Cook v. State, 940 S.W.2d 623, 627 n.6. (Tex. Crim. App. 1996).
45.  
Hurlbut v. Gulf Atl. Life Ins., 749 S.W.2d 762, 768 (Tex. 1987); Granada 
Biosciences, Inc. v. Forbes, Inc., 49 S.W.3d 610, 618 (Tex. App.—Houston 
[14th Dist.] 2001), rev’d on other grounds, 47 Tex. Sup. Ct. J. 162, 
2003 WL 22999362 (Tex. Dec. 19, 2003).
46.  
Hurlbut, 749 S.W.2d at 768; Granada, 49 S.W.3d at 618.
47.  
Hurlbut, 749 S.W.2d at 768; Granada, 49 S.W.3d at 618–19.
48.  
James v. Brown, 637 S.W.2d 914, 916–17 (Tex. 1982); Dallas ISD v. 
Finlan, 27 S.W.3d 220, 238 (Tex. App.—Dallas 2000), cert. denied, 
534 U.S. 949 (2001).
49.  
James, 637 S.W.2d at 916; Dallas ISD, 27 S.W.3d at 238.
50.  
Granada, 49 S.W.3d at 619; see also Minyard Food Stores, Inc. v. 
Goodman, 50 S.W.3d 131, 139–40 (Tex. App.—Fort Worth 2001), rev’d 
in part on other grounds, 80 S.W.3d 573 (Tex. 2002).
51.  
See Granada, 49 S.W.3d at 619; Minyard Food Stores, 50 S.W.3d at 
139–40.
52.  
Granada, 49 S.W.3d at 619.
53.  
Id.
54.  
Bentley, 94 S.W.3d at 578–79.
55.  
Milkovich v. Lorain Journal Co., 497 U.S. 1, 13, 110 S. Ct. 2695, 2702-03 
(1990); Bentley, 94 S.W.3d at 579.
56.  
Bentley, 94 S.W.3d at 581; Pisharodi, 116 S.W.3d at 862.
57.  
Bentley, 94 S.W.3d at 579.
58.  
Id. at 579–80; see also Granada, 49 S.W.3d at 619.
59.  
Bentley, 94 S.W.3d at 583.
60.  
Id. at 581–82.
61.  
Milkovich, 497 U.S. at 18–19, 110 S. Ct. at 2705–06; Bentley, 
94 S.W.3d at 583–84 (citations omitted).
62.  
Christy v. Stauffer Publ’n , Inc., 437 S.W.2d 814, 815 (Tex. 1969); see 
also Chang v. Linh Nguyen, 81 S.W.3d 314, 316 (Tex. App.—Houston [14th 
Dist.] 2001, no pet.).
63.  
See Tex. Penal Code Ann. § 36.05 (Vernon 2003) (tampering 
with witness).
64.  
See id. § 39.02(a)(1) (abuse of official capacity).
65.  
See id. § 37.09 (tampering with or fabricating physical 
evidence).
66.  
See Bentley, 94 S.W.3d at 583–84.
67.  
Tex. Civ. Prac. & Rem. Code Ann. § 73.002; Tex. Monthly, Inc. v. 
Transamerican Natural Gas Corp., 7 S.W.3d 801, 805 (Tex. App.—Houston [1st 
Dist.] 1999, no pet.).
68.  
Tex. Monthly, 7 S.W.3d at 805; see also Scripps Tex. Newspapers, 
99 S.W.3d at 836; Entravision Communications Corp. v. Belalcazar, 99 
S.W.3d 393, 398–99 (Tex. App.—Corpus Christi 2003, pet. denied).
69.  
See Swate v. Schiffers, 975 S.W.2d 70, 75 (Tex. App.—San Antonio 1998, 
pet. denied); see also Tex. Monthly, 7 S.W.3d at 805.
70.  
See Scripps Tex. Newspapers, 99 S.W.3d at 837; Entravision 
Communications Corp., 99 S.W.3d at 399.
71.  
See Tex. Civ. Prac. & Rem. Code Ann. § 51.015 (Vernon 1997).